UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| JL BEVERAGE COMPANY, LLC, | Case No. 2:11-cv-00417-MMD-CWH |
| Plaintiff, | |
| v. | ORDER |
| BEAM, INC. et al., | (Plf.'s Motion for Preliminary Injunction |
| Defendants. | – dkt. no. 36) |

## I.    SUMMARY

In this trademark infringement case, Plaintiff JL Beverage Company, LLC ("JL Beverage") asks the Court to determine that Defendants infringe upon JL Beverage's trademarked "lips images," which are displayed prominently on its bottles of flavored and unflavored vodka.  However, just like snowflakes and fingerprints, no two lip prints are the same.[1]  And as with snowflakes, fingerprints, and human lips, the trademarks in this case are not so similar as to create consumer confusion.  Accordingly, for the reasons stated herein, Plaintiff's Motion for Preliminary Injunction (dkt. no. 36) is denied.

## II.    BACKGROUND

Except where stated, the following facts appear without dispute in the preliminary injunction record.

---

[1] Norbert Ebisike, *The Investigative and Evidential Uses of Cheiloscopy (Lip Prints)*, 47 No. 4 Crim. Law Bulletin ART 4 ("Human lips are made up of wrinkles and grooves, just like fingerprints and footprints. Grooves are of several types and these groove types and wrinkles form the lip pattern which is believed to be unique to every individual.").

**A.     The Parties and Their Marks**

   **1.     Plaintiff's Marks**

JL Beverage manufactures, sells, and promotes a line of flavored and unflavored vodka called "Johnny Love."  Johnny Love comes in unflavored, apple, tangerine, aloha, and passion fruit flavors.  The vodkas are available for sale in four sizes.

The Johnny Love line of vodkas was created by bartender Johnny Metheny in or around 2003 and 2004.  At the time, Metheny owned several California restaurants and bars, most operating under the "Johnny Love" name ("Johnny Love" is Metheny's nickname).   Metheny noticed that flavored vodkas were "selling like crazy" but he thought they all "tasted horrible."  (Dkt. no. 47-6 at 9.)  Inspired by the possibility of making money in the beverage business, Metheny set out to make a "better flavored vodka."  (*Id.*)  As part of this endeavor, a friend of Metheny's designed the lips image used on his vodka logo.  In his declaration, Metheny stated that he chose to brand his vodka with lips because lips are "definitely sexy," but also "to impart flavor" by coloring the lips to denote the flavor within the bottle of vodka – red for unflavored, purple for passion fruit, yellow for aloha, orange for tangerine, and green for apple.[2]  (*See* dkt. no. 47-6 at 15.)

Since July 2005, Plaintiff has used two design marks in connection with its sale of the "Johnny Love" brand vodka and flavored vodkas:

   

_____

[2] The brand name "Johnny Love" appears on all bottles of vodka. The label "Johnny Love Vodka" only appears on JL Beverage's unflavored vodkas.  The other vodkas are labeled with the name "Johnny Love" above the flavor name (*e.g.*, "Johnny Love Tangerine").  JL Beverage has only registered the "Johnny Love Vodka" mark and the lips mark.

2

The mark on the left, called "Johnny Love Vodka" or the "JLV mark," is registered with the United States Patent and Trademark Office ("USPTO") as Registration No. 2,986,519 in International Class 033–Vodka (registered August 16, 2006).  The mark on the right is called the "JL Lips Mark," and is also registered with the USPTO under Registration No. 4,044,182 in International Class 033–Distilled Spirits (registered October 25, 2011).  Both images appear on the Johnny Love line of vodkas and flavored vodkas:



The JL Lips mark is imprinted at the top of the bottle and on the back label.  The mark on the back label is also colored to correspond to the flavor within the bottle:



Metheny sold the Johnny Love vodkas to Thomas Diab, JL Beverage's current president, in 2005.  JL Beverage asserts that the company has spent considerable time, effort, money, and other resources developing and promoting vodkas bearing its two marks.

2.      **Defendants' Mark**

Defendants Beam, Inc. and Jim Beam Brands Co. (collectively, the "Beam Defendants") own approximately 60 lines of alcoholic beverages.  One of these products is a line of flavored vodka called "Pucker Vodka."  The Beam Defendants purchased the Pucker brand from Koninklijke De Kuyper, B.V. ("De Kuyper") in 2010.  Although Pucker is not a new product, in Spring 2010 Defendant Jim Beam wanted to redesign and re-brand Pucker in order to "extend the equity of the Pucker brand and lips into flavored vodka."  To that end, Jim Beam hired the outside design firm of Libby, Perszyk, Kathman, Inc. ("LPK") to "independently create a unique look and feel for its Pucker vodka product . . . ."  (Dkt. no. 42 at 3.)   Defendants claim that they wanted LPK to create a marketing campaign that would communicate "intense flavor and intense fun" in connection with its Pucker vodka brand.  (Dkt. no. 42 at 3.)  As part of this campaign, Defendants and LPK re-branded the Pucker Vodka labels and bottles and developed a new marketing campaign for the brand.  The new Pucker Vodka launched in Spring 2011.   The bottles contain a prominent lips image on the center of its label.  Like with Johnny Love Vodka's labels, the lips image varies by color depending on the vodka flavor in the bottle.



4

1    The Beam Defendants instructed LPK to use both the Pucker name and lips as

2    part of any design it developed for Pucker's new label.  (Dkt. no. 46 at ¶ 12.)  Notably,

3    previous iterations of Pucker Vodka had used lips images in connection with its labeling

4    and logos.[3]  (*See* dkt. no. 48-1; 46 at ¶ 12.)  LPK provided Jim Beam with several

5    possible design options and the project team at Beam made final selections of the

6    proposed Pucker Vodka products and then sent their choices to the legal department at

7    Jim Beam for clearance.  The legal department found 40 references to lips for alcohol-

8    related products.  JL Beverage's JLV mark was in the search report.  However, Plaintiff's

9    application for JL Lips mark was not in the search report because JL Beverage had not

10   yet filed its registration application for that mark.  Beam's legal department approved a

11   bottle shape and label for the Pucker brand.

12   The Beam Defendants attempted to register their lips design on or around March

13   2011.  Defendant Beam filed applications for trademarks in the bottle/cap, the stylized

14   Pucker wording, and the lips design.  Later, an official in Beam's legal department

15   discovered that the lips mark selected by LPK to be featured in the center of Defendants'

16   vodka label was "stock art" from iStockphoto LP.  While Jim Beam was licensed to use

17   the lips, it did not have the right to claim ownership in the lips because the image was

18   owned by a different entity.  Defendants subsequently withdrew their USPTO application

19   for the lips design.  Defendants state that this was the only reason it withdrew its

20   application.  However, JL Beverage notes that Defendants' registration application was

21   rejected by the USPTO on June 10, 2011, and that USPTO officer cited Plaintiff's JL Lips

22   mark as a basis to refuse registration.

23   Defendants launched their newly-designed Pucker Vodka products nationwide in

24   March and April 2011.  Defendants advertise their Pucker Vodka flavored vodka line of

25   _____

26   [3]The Beam Defendants assert that they and their predecessor-in-interest have
     used registered Pucker marks and a registered lips design in connection with flavored
27   liquors since 1996.  (Dkt. no. 46-3 at ¶ 5.)  Defendants' use of lips in this manner is not
     within the scope of this lawsuit, and all parties agree that the Beam Defendants are the
28   junior users here.

1   products nationally through television and cable commercials, print advertisements in

2   national magazines, in-store and on-premise promotions at restaurants and bars, and

3   through digital advertising.  Defendants assert that they have expended considerable

4   resources and money towards promoting and selling their Pucker Vodka line of products.

5   JL Beverage alleges that Defendants' Pucker mark infringes upon both of its

6   registered trademarks and also its common law trademarks in its colored labeling.  JL

7   Beverage's primary argument is that Johnny Love and Pucker are similar products with a

8   similar key feature, lips, used in connection with their labels and marketing.  JL Beverage

9   also alleges that Defendants adopted the lips mark despite the fact that a Beam

10  employee knew that JL Beverage uses lips trademarks in connection with its line of

11  vodkas.

12  JL Beverage first informed Defendants of their allegedly infringing mark on March

13  18, 2011.  (Dkt. no. 36-1 at 17-19.)  On April 13, 2011, Defendants responded that they

14  did not believe their mark infringed Plaintiff's marks.  (Dkt. no. 36-1 at 22-25.)  JL

15  Beverage subsequently served Defendants with its original Complaint in July 2011.  The

16  First Amended Complaint alleges trademark infringement, false designation of origin,

17  common law trademark infringement, and unfair competition.  (Dkt. no. 30.)  Defendants

18  counterclaimed and moved to cancel registration of the JL Lips Mark.  (Dkt. no. 32 at 19,

19  20.)  JL Beverage filed this Motion for Preliminary Injunction (dkt. no. 36) on February

20  23, 2012.  JL Beverage asks the Court to enter a preliminary injunction against

21  Defendants.  As part of the injunction, Plaintiff requests that Defendants stop using the

22  current Pucker label in connection with their vodka bottles and promotional materials,

23  and that Defendants recall any and all Pucker Vodka bottles with the allegedly infringing

24  label as well as any other packaging, containers, advertising, or promotional materials

25  using the allegedly infringing mark  (dkt. no. 30 at 12, ¶ C).

26  **III.    PRELIMINARY INJUNCTION LEGAL STANDARD**

27  To qualify for a preliminary injunction, a plaintiff must demonstrate: (1) a likelihood

28  of success on the merits; (2) a likelihood of irreparable harm; (3) that the balance of

1  hardships favors the plaintiff; and (4) that the injunction is in the public interest.  *Winter v.*

2  *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

3  **IV.     LIKELIHOOD OF SUCCESS ON THE MERITS**

4        To establish a likelihood of success on the merits of a trademark infringement

5  claim, the plaintiff must establish that he is "(1) the owner of a valid, protectable mark,

6  and (2) that the alleged infringer is using a confusingly similar mark."  *Grocery Outlet,*

7  *Inc. v. Albertson's, Inc.*, 497 F.3d 949, 951 (9th Cir. 2007).  The parties do not dispute

8  ownership or validity for the purposes of this Motion.[4]  Therefore, the Court must

9  determine whether the two marks are likely to cause confusion in the marketplace.

10        The Ninth Circuit uses the non-exhaustive eight factor *Sleekcraft* test for

11  determining likelihood of consumer confusion: (1) strength of the mark; (2) proximity or

12  relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5)

13  marketing channels used; (6) type of goods and the degree of care likely to be exercised

14  by the purchaser; (7) the defendant's intent in selecting the mark; and (8) the likelihood

15  of expansion of the product lines.  *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 &

16  n.11 (9th Cir. 1979), *abrogated in part on other grounds by Mattel, Inc. v. Walking*

17  *Mountain Prods.*, 353 F.3d 792, 810 (9th Cir. 2003).  "Some *Sleekcraft* factors are much

18  more important than others, and the relative importance of each individual factor will be

19  case specific."  *M2 Software, Inc., v. Madacy Entm't*, 421 F.3d 1073, 1080 (9th Cir.

20  2005) (quotation marks and citation omitted).  "In essence, the test for likelihood of

21  confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be

22  confused as to the origin of the good or service bearing one of the marks."  *Id.* (citations

23  and brackets omitted).

24        JL Beverage alleges both forward and reverse trademark confusion.  "In the usual

25  [forward] infringement case," a court must determine "whether junior user is palming off

26  _____

27        [4] As discussed *infra*, Defendants filed a counterclaim disputing the validity of the
   JL Lips mark and have filed a petition to cancel the mark's federal registration.

28  Defendants do not dispute ownership or the validity of the JLV mark.

its products as those of the senior user.  Would a consumer who finds a running shoe marked Mike be bamboozled into thinking that it was manufactured by Nike?" *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129-30 (9th Cir. 1998). Conversely, reverse confusion "occurs when the junior user saturates the market with a similar trademark and overwhelms the senior user."  *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 703 F. Supp. 2d 671, 688 n.19 (W.D. Ky. 2010) (citing *Ameritech, Inc. v. Am. Information Techs. Corp.*, 811 F.2d 960, 964 (6th Cir. 1987).  "The public comes to assume the senior user's products are really the junior user's or that the former has become somehow connected to the latter."  *Maker's Mark*, 703 F. Supp. 2d at 688, n.19 (citing *Ameritech*, 811 F.2d at 964).

Accordingly, the Court must determine whether a reasonable consumer interested in purchasing vodka or flavored vodka could think that JL Beverage produces Pucker or that Pucker Vodka is the same product as Johnny Love Vodka (forward confusion), *or* could think that the Beam Defendants produce Johnny Love Vodka or that Johnny Love Vodka is the same product as Pucker Vodka (reverse confusion).  *See M2 Software, Inc., v. Madacy Entm't*, 421 F.3d at 1080.

A.    The JLV Mark



JL Beverage uses the JLV mark on bottles of its unflavored vodka.

1.    Factor 1:  Strength of the Mark

"The more likely a mark is to be remembered and associated in the public mind with the mark's owner, the greater protection the mark is accorded by trademark law." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000).  "The strength of the trademark is evaluated in terms of its conceptual strength and commercial strength."  *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 846 F. Supp. 2d 1063, 1078 (N.D. Cal. 2012).  However, "[i]n reverse confusion cases, courts evaluate the

1  conceptual strength of the senior user's mark and compare it to the commercial strength

2  of the junior user's mark." *Moose Creek, Inc. v. Abercrombie & Fitch Co.*, 331 F. Supp.

3  2d 1214, 1224 (C.D. Cal. 2004); *see also Dreamwerks Prod. Group, Inc. v. SKG Studio*,

4  142 F.3d 1127, 1130 n.5 (9th Cir. 1998); *Playmakers, LLC v. ESPN, Inc.*, 297 F. Supp.

5  2d 1277, 1281 (W.D. Wash. 2003) ("*Playmakers I*"), *aff"d sub nom. Playmakers LLC v.

6  ESPN, Inc.*, 376 F.3d 894 (9th Cir. 2004) ("*Playmakers II*").  "The ultimate question in a

7  reverse confusion case is whether consumers doing business with the senior user might

8  mistakenly believe that they are dealing with the junior user." *Playmakers II*, 376 F.3d at

9  897 (quotation marks and citation omitted).

10      Therefore, the Court considers (1) the conceptual strength of the JLV mark, for

11  the purposes of both forward and reverse confusion; (2) the commercial strength of the

12  JLV mark, for the purposes of forward confusion; and (3) the commercial strength of the

13  Pucker Vodka mark, for the purposes of reverse confusion.

14              **a.      Conceptual strength of the senior mark**

15      "The conceptual strength of a mark refers to its categorization on the continuum of

16  'genericness' to arbitrariness, with arbitrary marks being entitled to the highest degree of

17  protection from infringement." *Playmakers I*, 297 F. Supp. 2d at 1281.  "Generic marks

18  are those that refer to the genus of which the particular product is a species." *One

19  Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1164 (9th Cir. 2009) (citing *Two

20  Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (internal quotation marks

21  omitted)).  "Descriptive terms directly describe the quality or features of the product."

22  *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1058, n.19 (9th Cir.

23  1999).  "A suggestive mark conveys an impression of a good but requires the exercise of

24  some imagination and perception to reach a conclusion as to the product's nature." *Id.*

25  "Finally, arbitrary and fanciful marks have no intrinsic connection to the product with

26  which the mark is used; the former consists of words commonly used in the English

27  language . . . whereas the latter are wholly made-up terms." *Id.* at 1164 (quotation

28  marks and citation omitted).

Because the JLV mark contains the word "vodka," the Court determines that the mark is descriptive.  It describes the primary feature of the Johnny Love brand product: vodka.  In its briefings, JL Beverage focuses not on the entire mark, but solely the lips.  JL Beverage argues that "to associate 'lips' to a bottle of vodka requires great imagination, and therefore" the mark is arbitrary or fanciful.  (Dkt. no. 61 at 3.)  It is true that the lips portion of the JLV mark is the only part that Defendants could potentially infringe upon; it is the only common feature shared by the two trademarks.  However, "under the anti-dissection rule, the validity and distinctiveness of a composite trademark is determined by viewing the trademark as a whole, as it appears in the marketplace." *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1392 (9th Cir. 1993).  This is because "[w]hether a mark suggests or describes the goods or services of the trademark holder depends, of course, upon what those goods or services are." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142 (9th Cir. 2002).  JL Beverage uses the JLV mark in commerce as a whole.  Although Plaintiff does at times only use the lips portion of the mark in commerce (for example, on the imprint at the top of the bottle cap), JL Beverage owns and has registered the lips mark as a separate trademark.[5]

The Court's conclusion on this point would not differ even were it to examine the conceptual strength of the lips portion of the JLV mark alone.[6]  The 'lips' portion of the

---

[5]JL Beverage argues that its mark is conceptually strong because it is registered and has obtained incontestability.  (Dkt. no. 36 at n.1.)  However, "an incontestable mark may be sufficiently strong for registration purposes, i.e. not generic, but may still be relatively weak for likelihood of confusion purposes." *Playmakers*, 297 F. Supp. 2d at 1281.  Moreover, though registration "alone may be sufficient in an appropriate case to satisfy a determination of distinctiveness[,] . . . while the registration adds something on the scales, [courts] must come to grips with an assessment of the mark itself." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011).

[6]While courts tend to consider the mark as a whole when determining the strength of the mark, sometimes considering the mark's most salient feature is also important.  For example, the presumption of inherent distinctiveness that attaches to a mark when it obtains registration without requiring proof of secondary meaning applies to the most salient feature of the mark.  *See KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 603-604 (9th Cir. 2005).  Here, because the lips portion of the JLV mark is the mark's most salient feature, and because the only portion of the mark *(fn. cont…)*

1    mark is not descriptive.  It is arbitrary, because it is a symbol in "common linguistic use

2    but which, when used with [vodka], neither suggest[s] nor describe[s] any ingredient,

3    quality or characteristic of those goods or services."  *Moose Creek*, 331 F. Supp. 2d at

4    1222.  Yet "even an arbitrary mark may be classified as weak where there has been

5    extensive third party use of similar marks on similar goods."  *Matrix Motor Co., Inc. v.*

6    *Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d 1083, 1091 (C.D. Cal. 2003).   "This

7    is known as the 'crowded field' doctrine."  *Moose Creek*, 331 F. Supp. 2d at 1224

8    (citation omitted).   "In a crowded field of similar marks, each member of the crowd is

9    relatively weak in its ability to prevent use by others in the crowd."  *One Indus.*, 578 F.3d

10   at 1164 (internal quotation marks omitted).   "[T]hat the marketplace is replete with

11   products using a particular trademarked word" or symbol "indicates not only the difficulty

12   in avoiding its use but also, and directly, the likelihood that consumers will not be

13   confused by its use."  *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir.

14   2002).  Defendants provide numerous examples of alcoholic beverages that use lips as

15   trademarks or as part of their trademarks.  (*See, e.g.,* dkt. nos. 47, 49-1, 49-2, 49-4, 49-

16   5, 49-6, 49-7, and 49-8.)  These examples include lips marks used on product labels for

17   prepared vodka cocktails, wine, and beer.  (*See id.*)  Plaintiff argues that none of these

18   lips images are associated with vodka bottles or flavored vodka bottles.  However, JL

19   Beverage defines the relevant market for similar goods too narrowly.   When considering

20   whether the senior mark is weakened by its presence in a "crowded field" of similar

21   marks, the relevant field is "a field which at least broadly would include or be related to

22   [the] plaintiff's business."   *Halo Mgmt., LLC v. Interland, Inc.*, 308 F. Supp. 2d 1019,

23   1034 (N.D. Cal. 2003) (citing *PostX Corp. v. docSpace Co., Inc.*, 80 F. Supp. 2d 1056,

24   1061 (N.D. Cal. 1999)); *see also Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314

25   F.2d 149, 159-160 (finding that whiskey and beer were related products).  The fact that

26

27   *(…fn. cont.)*
     Defendants allegedly infringe upon is the lips, the Court examines the strength of the lips
28   portion of the mark alone.

1    lips symbols are a prominent feature of several other alcohol products reduces the JLV

2    mark's strength.

3                              **b.    Commercial strength of the senior mark**

4         "Identifying  whether  a  mark  is  generic,  descriptive,  suggestive,  arbitrary  or

5    fanciful, however, is only the first step of the inquiry."  *One Indus.*, 578 F.3d at 1164.

6    "The second step is to determine the strength of this mark in the marketplace."  *Miss*

7    *World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988),

8    *abrogated in part on other grounds as recognized in Eclipse Assocs. Ltd. v. Data Gen.*

9    *Corp.*, 894 F.2d 1114 (9th Cir.1990).  As mentioned, the commercial strength of the

10   senior mark is relevant for the Court's forward confusion analysis only.

11        The commercial strength of a mark refers to its degree of recognition in the minds

12   of the relevant consumer class, and it is often measured by the junior user's amount and

13   volume of advertising.  *See Playmakers I*, 297 F. Supp. 2d at 1281.  "Commercial

14   strength is based on actual marketplace recognition, and thus advertising expenditures .

15   . . ." are often a sound measure of commercial success.  *Network Automation, Inc. v.*

16   *Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011) (quotation marks

17   and citation omitted).

18        There is significant evidence that JL Beverage has a relatively weak presence in

19   the marketplace.  It engages in local rather than national advertising and has a small

20   advertising budget.  The evidence provided by Mr. Diab in his deposition demonstrates

21   that JL Beverage is still a small, growing corporation with a minimal presence on alcohol

22   and grocery store shelves.  (*See, e.g.*, dkt. no. 47-7 at 21.)

23        Therefore, because the JLV mark (1) contains a description of the product; (2)

24   uses an image commonly used and associated with alcoholic beverage products; and (3)

25   has relatively weak commercial presence, the Court determines that the mark's overall

26   strength is weak for the purposes of JL Beverage's forward confusion claim.

27   *///*

28   *///*

12

### c.   Commercial strength of the junior mark

Pucker Vodka's commercial strength is relatively strong.  The Beam Defendants presented evidence that Jim Beam spends a significant amount of money on national ads.  Jim Beam promotes Pucker Vodka in national advertisements spanning a wide array of mediums, including television/cable, print ads, in-store and on-premise promotions at restaurants and bars, and digital advertising.  *Accord Maker's Mark*, 703 F. Supp. 2d at 690 (holding that a mark had strong commercial strength where the company spent $22 million annually on marketing and engaged in a national advertising campaign with ads spanning various mediums).

Accordingly, because the conceptual strength of the JLV mark is relatively weak and the commercial strength of the Pucker mark is strong, the Court determines that factor one favors the Beam Defendants for the purposes of its reverse confusion analysis.[7]  The senior mark is often weak in cases of reverse confusion.  *See Moose Creek*, 331 F. Supp. 2d at 1225-26 (noting that although it "may appear somewhat at odds with the prevailing sentiment that commercial  'Davids' should not be disadvantaged in their struggle against their 'Goliath' competitors . . . it is nevertheless true that '[i]n a case of reverse confusion . . . the senior user's mark is usually weaker than the junior user's.'").

### 2.   Factor 2: Proximity or Relatedness of the Goods

"The standard for deciding whether the parties' goods or services are related is whether customers are 'likely to associate' the two product lines."  *Surfvivor Media, Inc. v. Survivor Prods*., 406 F.3d 625, 633 (9th Cir. 2005) (citation and remaining internal quotation marks omitted); *see also Sleekcraft*, 599 F.2d at 350 (goods are related when

---

[7]JL Beverage makes much of the fact that Defendants attempted to register their "lips" mark but abandoned that attempt, and of the fact that the USPTO cited the JL Beverage's mark as a potential bar to the registration of Defendants' lips mark.  (Dkt. no. 36 at 9-10.)  This evidence may demonstrate that Defendants' mark is conceptually weak, but it has nothing to do with the commercial strength of Defendants' mark, the relevant inquiry here.

1  there is a likelihood that the consumer will "assume there is an association between the

2  producers of the related goods, though no such association exists."). "Proximity of the

3  parties' goods exists where they are (1) complementary, (2) sold to the same class of

4  purchasers, or (3) are similar in use or function." *Matrix Motor Co.*, 290 F. Supp. 2d at

5  1092.

6      This factor weighs in JL Beverage's favor. (*See* dkt. no. 42 at 22.) The products

7  are similar – vodka and flavored vodka – and would therefore be sold in the same

8  section of the grocery store or liquor store. Moreover, the companies sell their products

9  to the same class of purchasers – alcohol distributors. (*See* dkt. no. 36-1 at ¶ 13.)

10                  **3.      Factor 3: Similarity of the Marks**

11      Courts consider "sight, sound and meaning to determine the similarity of

12  competing marks." *One Indus.*, 578 F.3d at 1162 (quotation marks and citation omitted).

13  Here, sight is the most important sub-factor, because the parties discuss consumer

14  confusion primarily in the context of buyers interested in purchasing a bottle of their

15  respective vodkas at a liquor or grocery store. *See, e.g., id.* at 1162-73 (determining that

16  since the case involved competing motocross product logos, sight was the most

17  important sub-factor because any consumer confusion there "would occur as motocross

18  enthusiasts select helmets inside a store or during online browsing."). "Sound" is also

19  relevant, because purchasers could potentially ask for the type of vodka by name at a

20  store, bar, or restaurant.[8]

21      "In considering the degree of similarity between the two marks, courts should

22  analyze each mark within the context of other identifying features." *Surfvivor*, 406 F.3d

23  at 633. Here, the marks' composite parts are not similar, and taken as a whole, the two

24  trademarks are dramatically different.

25

26  _____

27      [8]Meaning is of little import here, because understanding the meaning of a symbol
    on a bottle's label is not typically part of the experience of purchasing alcoholic
    beverages. *Accord One Indus.*, 578 F.3d at 1163 ("mentally pondering the meaning of

28  the marks[] is not part of buying a motorcycle helmet.").

 

First, the bottles' shapes are distinct.  JL Beverage uses a stock wine bottle in the "Bordeaux-style" with a long neck whereas Defendants use a cylindrical bottle.  The bottle caps are markedly different: whereas JL Beverage uses a traditional-style cap, akin to those covering a typical wine bottle, bottles of Pucker are closed with a unique cylindrical, thick plastic colored cap.  The cap is colored to correspond to the vodka flavor and also has a grooved wave pattern running diagonally across it.

Second, the product labeling is not similar.  Johnny Love's label is silver with minimal wording, a small image denoting the flavor of the vodka at the bottom of the label, and is in black lettering.  The Pucker Vodka bottle by contrast uses purple and white lettering.  Pucker labels not only contain a lips image, but also images of fruit (the fruit corresponding to the flavor of the vodka in the bottle), and colored ink blots (also colored to correspond to the flavor in the bottle).  The Pucker label's background color is not silver like with the Johnny Love bottle, but colored on top and bottom with a white portion in the middle.  Finally, the two products use different fonts.

Defendants argue that the presence of both parties' house marks – the names "Johnny Love Vodka" and "Pucker" appear prominently on each bottle – decreases the marks' similarity.  "In *Sleekcraft*, the Ninth Circuit noted that the use of a housemark can reduce the likelihood of confusion[.]"  *Marketquest Group, Inc. v. BIC Corp.*, No. 11-cv-618, 2011 WL 5360899, at *9 (S.D. Cal. Nov. 7, 2011).  Here, the presence of the house mark reduces confusion for the purposes of JL Beverage's forward confusion claim.

15

Consumers looking to purchase vodka and/or flavored vodka are less likely to be confused about the source of the vodka because each mark clearly delineates the brand.

However, "[i]n the reverse confusion context," the "addition of a celebrity 'housemark' to an allegedly infringing mark may heighten confusion rather than reduce it." *Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 995 (C.D. Cal. 2002); *see also A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 230 (3d Cir. 2000) ("As to the presence of the housemark on the [famous defendant's] product, not only is there the possibility that consumers will fail to remember the mark when encountering [the plaintiff's] swimwear, but there is also the possibility that the mark will aggravate, rather than mitigate, reverse confusion, by reinforcing the association of the [at-issue] word 'miracle' exclusively with [defendant].")  Such a scenario could potentially occur here, were consumers to associate lips images with the junior, more famous Pucker brand. However, the Court's analysis on this point is somewhat complicated by the fact that Pucker, though the junior user, has used lips images as part of its branding since 1996. (Dkt. no. 46-3 at ¶ 5.)  So consumers may *already* associate lips images with Pucker Vodka.  In light of this, the Court determines that the parties' respective uses of house marks on their vodka labels favors neither party for the purposes of reverse confusion.

Third, the lips images are distinct.  They are used in a different fashion on their respective vodka bottles.  The Johnny Love lips image is used as the "o" in the word "love" on the vodka label.  On Defendants' bottle, the lips stand alone, are very large, and appear to be the focal point of the label.[9]  While both marks use images of lips, that basic commonality does not make them similar for the purpose of trademark infringement.

---

[9]While the concept of coloring the lips to denote the vodka flavor within the bottle is common to both trademarks, as mentioned JL Beverage has not registered its colored lips marks. This similarity is noted by the Court and will be addressed *infra* in the discussion of JL Beverage's common law trademark claims.

 

JL Beverage's lips show only a few lip creases and are more rounded than Defendants', shaped almost like an "o".  Defendants' lips are oval, elongated, have many more creases than JL Beverage's, and are surrounded not by a word, but by colored ink blotches.

Though not as important as the "sight" subfactor in this case, the Court concludes that the two trademarks do not sound the same.  JL Beverage asserts that "consumers would verbally describe the marks as 'lips' given the prominent appearance of the 'human lips' design for both parties," and therefore "the sound of Plaintiff's Marks would be identical to the LIPS mark being used by the Beam Defendants."  (Dkt. no. 61 at 6.)  But neither product is called "lips" or "lips vodka."  As Defendants correctly point out, consumers would call the products either "Johnny Love" or "Pucker" – two names that sound nothing alike – when asking for the respective vodkas over the phone or at a bar or restaurant.  (Dkt. no. 42 at 12.)

### 4.    Factor 4: Evidence of Actual Confusion

JL Beverage provides numerous examples of what it deems to be consumer confusion.  For example, on July 15, 2011, a woman named Erin Murphy contacted Shaun Robertson, JL Beverage's North Carolina broker, stating that she saw JL Beverage's new bottle at an ABC Store.  (Dkt. no. 36-2 at 5.)  The bottle was a bottle of Pucker Vodka. (*Id.*)  On October 16, 2011, a man named Sam Mills contacted Robertson stating that he purchased Pucker cherry flavored vodka thinking it was Johnny Love Vodka.  (Dkt. no. 36-2 at 4.)  On February 15, 2011, a man named Michael C. Herring, who identified himself as the Chief Administrator of the North Carolina Alcohol and Beverage Control Commission, emailed Robertson's company about distributing Johnny

1  Love Vodka in North Carolina, and in the email also wrote: "see attached.  This is Jim

2  Beam's new line of vodka.  Looks a lot like Johnny Love."  (Dkt. no. 36-2 at 7.)  JL

3  Beverage provides numerous other similar instances of alleged consumer confusion

4  between the two vodka bottles.

5      Defendants counter that JL Beverage's proffered evidence of actual confusion is

6  inherently unreliable because it was provided by friends of Plaintiff's employees and its

7  broker and broker's friends.  (Dkt. no. 42 at 18.)  Because they have a financial interest

8  in the success of the product, broker and distributor opinions about actual confusion are

9  of "little probative value."  *Global Mfg. Group, LLC v. Gadget Universe.com*, 417 F. Supp.

10  2d 1161, 1174 (S.D. Cal. 2006).   And the evidence from friends of JL Beverage

11  employees is likewise of limited weight because "[e]vidence of secondary meaning from

12  a partial source possesses very limited probative value."  *Filipino Yellow Pages v. Asian*

13  *Journal of Publications, Inc.*, 198 F.3d 1143, 1152 (9th Cir. 1999).  JL Beverage does not

14  deny that the evidence comes from informal sources familiar with the JL Beverage brand

15  and its employees and contractors.

16      Defendants also argue that JL Beverage's evidence of actual confusion consists

17  of double, triple, and quadruple hearsay.  The record demonstrates that at least some of

18  the examples of alleged consumer confusion involve multiple levels of hearsay.  For

19  example, many of the instances of alleged confusion involve Mr. Robertson recounting

20  via email his conversations with various consumers.  (Dkt. no. 36-2 at 4); *see Japan*

21  *Telecom, Inc. v. Japan Telecom Am., Inc.*, 287 F.3d 866, 874 n.1 (9th Cir. 2002)

22  (statements that declarant knows of others who were confused by similar trademarks is

23  inadmissible hearsay).

24      Finally, some of the alleged evidence of actual confusion includes consumers

25  noting that the two vodkas look alike.  For example, Mr. Herring commented that Pucker

26  "looks like" Johnny Love.  (Dkt. no. 36-2 at 5.)  Such evidence demonstrates *lack* of

27  confusion because it shows that Mr. Herring understood that Johnny Love and Pucker

28  ///

1  are distinct products.  *See, e.g., Duluth News-Tribune v. Mesabi Publication Co.*, 84 F.3d

2  1093,1098 (8th Cir. 1996).

3      In light of the above, there are several potential problems with the reliability and

4  admissibility of JL Beverage's proffered evidence of actual confusion.  Later discovery

5  may strengthen this evidence, but the Court determines that for the purposes of this

6  Motion, factor four weighs in neither party's favor.  *See Sleekcraft*, 599 F.2d at 353

7  ("Because of the difficulty in garnering" evidence of actual confusion, "the failure to prove

8  instances of actual confusion is not dispositive.").

9              **5.    Factor 5: Marketing Channels Used**

10      "Convergent marketing channels increase the likelihood of confusion."

11  *Groupion, LLC v. Groupon, Inc.*, 826 F. Supp. 2d 1156, 1164 (N.D. Cal. 2011) (quotation

12  marks and citations omitted).

13      JL Beverage argues that the marketing channels used here are identical.  Both

14  parties use the 3-tier distribution system for the sale of alcoholic spirits.[10]  According to

15  JL Beverage, because "[d]istributors carry scores of different products but are absolutely

16  calculated at balancing their portfolios of diverse products with non-overlapping

17  attributes . . .", the identical channels of trade make it difficult for Johnny Love Vodka to

18  be picked up by distributors.   (Dkt. no. 36 at 15; no. 36-1 at ¶¶ 13, 14.)  JL Beverage

19  argues that this difficulty is further complicated by the fact that it is easier for companies

20  with other alcoholic products already represented by the distributor to obtain

21  representation for a new line of products than it is for a new company to obtain

22  representation.  (*Id.*)  Here, while Defendants manufacture approximately 60 different

23  lines of alcoholic beverage products, JL Beverage sells only the Johnny Love line of

24  vodka and flavored vodkas.  (*Id.*)

25  ///

26  _____

27      [10]The "3-tier distribution system" refers to the chain of sale from
    manufacturer/supplier to wholesale distributor to licensed retail establishment to
28  consumer.

1        Defendants counter first by arguing that the marketing tactics used by each

2    party are different, but the relevant inquiry involves marketing *channels*, not marketing

3    tactics. Defendants then argue that even if the marketing channels are identical,

4    Defendants can only be enjoined in the geographic areas where JL Beverage actively

5    sells its vodkas.  Defendants invoke the *Dawn Donut* rule to support their argument:

6            Under the *Dawn Donut* rule, even if a federal registrant has rights in a
             mark, it is not necessarily entitled to an injunction against an unauthorized
7            user: "if the use of the marks by the registrant and the unauthorized user
             are confined to two sufficiently distinct and geographically separate
8            markets, with no likelihood that the registrant will expand his use into the
             defendant's market, so that no public confusion is possible, then the
9            registrant is not entitled to enjoin the junior user's use of the mark." . . .
             Only once the federal registrant has expanded its use of the mark, so that
10           the market areas of the two users are no longer separate and distinct, will
             the registrant be entitled to an injunction.

11

12   *Kerzner Int'l Ltd. v. Monarch Casino & Resort, Inc.*, 675 F. Supp. 2d 1029, 1047 (D. Nev.

13   2009) (citing *Dawn Donut Co., Inc. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 364 (2d

14   Cir. 1959)).  Defendants argue that in light of the *Dawn Donut* rule, "Plaintiff must show

15   not only that it is actively selling product so as to create consumer recognition of its

16   product, but also where those sales are being made."  (Dkt. no. 42 at 24.)  Defendants

17   assert that JL Beverage has not provided evidence that it is actively selling its product in

18   each of Defendants' markets.  However, the *Dawn Donut* rule plainly does not apply to

19   this case. (*Id.*)  JL Beverage has distributors in 20 states, a Federal Basic Alcohol Permit

20   to sell in all 50 states, and is pursuing expansion of its product line nationally.  (*See* dkt.

21   no. 62-2.)  While there is some evidence that Johnny Love Vodka may not be currently

22   experiencing strong sales, the fact that Johnny Love is sold in at least 20 states and JL

23   Beverage is working towards selling it in all fifty states suffices to make *Dawn Donut*

24   inapplicable here.[11]

25

26   _____

27          [11]Defendants dispute these facts in their Surreply (dkt. no. 97), arguing that JL
     Beverage's presence is far more minimal and less geographically diffuse than Diab
28   states.  Yet given the undisputed evidence that JL Beverage is at the very least working
     towards expanding its brand to all fifty states, it cannot be said that there is "*no*
     (fn. cont…)

1    JL Beverage has demonstrated that the marketing channels are identical.

2    Moreover, given the nature of the 3-tier distribution market for alcohol, the fact that the

3    marketing channels are identical places JL Beverage at a particularly significant

4    disadvantage.  This factor favors JL Beverage.

5
6    **6.   Factor 6: the Type of Good and Degree of Care Likely to be Exercised by the Consumer**

7    "In assessing the likelihood of confusion to the public, the standard used by the

8    courts is the typical buyer exercising ordinary caution."   *Sleekcraft*, 599 F.2d at 353.

9    What is expected of this reasonably prudent consumer depends on the circumstances:

> [w]e expect him [the reasonable consumer] to be more discerning – and
> less easily confused – when he is purchasing expensive items, *see, e.g.,*
> *Official Airline Guides*, 6 F.3d at 1393 (noting that confusion was unlikely
> among advertisers when the products in question cost from $2,400 to
> $16,000), and when the products being sold are marketed primarily to
> expert buyers, *see, e.g., Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d
> 1531, 1537 (9th Cir.1989).

14   *Brookfield*, 174 F.3d at 1060.

15   The parties agree that both Johnny Love and Pucker are "call brands" rather

16   than "well brands," and that the two drinks fall into the same price category.[12]  Johnny

17   Love costs $18.99 while Pucker costs $15.99.   This factor therefore weighs in JL

18   Beverage's favor.

19   ///

20   ///

21   ///

22   _____

23   *(…fn. cont.)*
*likelihood*" that the JL Beverage will expand its use into all of Defendants' markets, as
required by *Dawn Donut.  See Kerzner Int'l*, 675 F. Supp. 2d at 1047 (emphasis added).

25   [12]Plaintiff explains the difference between "well brands" and "call brands:" "'Well
brands' are less expensive liquor brands and are what a bar patron would receive if he
or she orders a drink without requesting a specific brand (well brands are usually kept in
the "well" of the bar, out of sight). 'Call brands,' on the other hand, are the more
expensive, higher prestige brands that are typically showcased on the back shelf of a
bar and which consumers usually must specifically request (e.g., asking for a Smirnoff
screwdriver.")."  (Dkt. no. 36 at 17.)

28

1

### 7.    Factor 7: Defendants' Intent in Selecting the Mark

2       "This factor favors the plaintiff where the alleged infringer adopted his mark with

3  knowledge, actual or constructive, that it was another's trademark."[13]   *Brookfield*, 174

4  F.3d at 1059.

5       Here, it is clear that at some point in the development of its Pucker Vodka label,

6  Defendants were at the very least aware of Plaintiff's trademark, and that at least one of

7  Jim Beam's employees was aware of the Johnny Love Vodka brand.  However, such

8  knowledge is of little weight in light of the circumstances surrounding Defendants' Pucker

9  Vodka campaign.    First, the record demonstrates that Defendants and their

10 predecessors in interest have used different lips images as part of Pucker's branding

11 since 1996. (Dkt. no. 46-3 at ¶ 5.)  Thus, while JL Beverage is the senior user of the

12 'lips' mark, De Kuyper, Defendants' predecessor in interest, used lips images in

13 commerce several years before JL Beverage's existence.  In fact, Kimberly Washington,

14 Jim Beam's Senior Director of Vodka, Cognac, and Gin, and the person who oversaw

15 the design, development, and promotion of Pucker Vodka at Beam (dkt. no. 46 at ¶ 3),

16 instructed LPK to include lips images in any original design it developed for the Pucker

17 product (*id.* at ¶  12). This is significant because it decreases the likelihood that

18 Defendants wrongfully treaded upon JL Beverage's lips mark in its redesign and

19 repackaging of Pucker, and makes it more likely that Defendants merely wanted to

20 continue to use an image that had long been associated with the Pucker brand.

21       Second, Defendants present evidence that LPK, the outside design firm tasked

22 with creating a new label and marketing campaign for Pucker Vodka, did not know about

23 the Johnny Love line of vodkas.  (Dkt. no. 43 at ¶¶ 4-6.)  Nor is there evidence that

24 members of Jim Beam's Pucker Vodka team knew about Johnny Love vodka line.  In

25 ────────────────

26       [13]In a reverse confusion case, "the intent inquiry must . . . focus on whether the
   defendant was aware of the senior user's use of the mark in question, or whether the
27 defendant conducted an adequate name search for other companies marketing similar
   goods or services under that mark."  *Commerce Nat. Ins. Services, Inc. v. Commerce*
28 *Ins. Agency, Inc.*, 214 F.3d 432, 444 (3d Cir. 2000).

1    fact, Ms. Washington testified that the Beam Pucker Vodka project team had no

2    knowledge of the Johnny Love product or marks during the development of its Pucker

3    campaign.  (Dkt. no. 46 at ¶ 14.)  Moreover, the evidence regarding Jim Beam employee

4    Emily Johnson's knowledge of the Johnny Love products is not demonstrative of ill

5    intent.  Johnson learned about the Johnny Love products before becoming a Jim Beam

6    employee in 2007.  (Dkt. no. 44 at ¶ 3.)  She met Mr. Diab on a college spring break trip

7    in Las Vegas, and the two spoke briefly about the Johnny Love product.  (*Id.* at ¶ 4.)

8    While employed at Beam, Johnson sent an email from her personal email account to Mr.

9    Diab mentioning that she had seen JL Beverage's "Aloha Vodka" on a data report.  (*Id.*

10   at ¶ 5.)  That was the extent of Ms. Johnson's contact with JL Beverage.  Importantly,

11   there is no evidence that Ms. Johnson's knowledge of JL Beverage products influenced

12   the Pucker Vodka project team at Beam or LPK.  Rather, Johnson was a Business

13   Analyst, and testified that while she provided "financial modeling/analysis to the

14   PUCKER vodka design team during the development of the products," she had no

15   "influence on the design team in the creation, selection or adoption of the PUCKER

16   vodka designs."  (*Id.* at ¶ 6.)  Even had Ms. Johnson informed the Pucker team at Jim

17   Beam that she knew about Johnny Love Vodka, for reasons explained below, this

18   evidence alone would not be enough to demonstrate intent to exploit JL Beverage's

19   mark.

20          Third, the fact that Jim Beam withdrew its application for a trademark on its design

21   is of no import here.  JL Beverage asserts that Defendants withdrew their application

22   once they found out that the JLV marks were a potential bar to registration.[14]  (Dkt. no. 6

23   36 at 6.)  Yet "there is no presumption of bad faith just because someone knew that a

24   senior user existed."  *Playmakers*, 297 F. Supp. 2d at 1284.  For example, in *M2*

25

26   _____

27          [14]Defendants argue that they withdrew their PTO application when they
     discovered that the lips image used on the new Pucker label was "stock art," and that
     this was the sole reason Defendants abandoned their federal trademark application.
28   (Dkt. no. 45 at ¶ 17.)

*Software*, a trademark infringement case involving competing music distributors, plaintiff M2 presented evidence that defendant Macady was aware of plaintiff's mark when defendant adopted its trademark.  421 F.3d at 1085.  However, the court determined that this factor weighed in Macady's favor because M2 did not demonstrate that Macady "had any intention of capitalizing on M2 Software's trademark."  *Id.*

Factor seven therefore favors neither party.  *See Self-Ins. Inst. of Am., Inc. v. Software & Info. Indus. Ass'n*, 208 F. Supp. 2d 1058, 1074 (C.D. Cal. 2000) ("a lack of intent to confuse is largely irrelevant in determining if consumers likely will be confused.") (citing *Brookfield*, 174 F.3d at 1059) (internal quotation marks omitted).

### 8.  Factor 8: Likelihood of Expansion

When the goods or services of the parties are related, this factor is irrelevant.  *See Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1029 (9th Cir. 2004).  This factor therefore weighs in neither party's favor.

### 9.  Balancing the Factors

This is not a case where the factors overwhelmingly favor either party.  Factors one and three strongly favor Defendants.  Factors 2, 5, and 6 favor JL Beverage.  Factors 4, 7, and 8 favor neither party.

As mentioned, the relative import of each *Sleekcraft* factor is case-dependent. The very fact that this case involves similar products means that certain factors – degree of care, marketing channels, proximity of goods – almost automatically favor JL Beverage.  In light of this, and given that JL Beverage's allegations center around the alleged similarity between the parties'  use of 'lips' in their marks, the most important factor here is factor three, similarity of the marks.  In fact, "[t]he similarity of marks 'has always been considered a critical question in the likelihood-of-confusion analysis.'"  *M2 Software*, 421 F.3d at 1082.  The marks at issue, both their composite parts and when viewed as a whole, are not similar.  For this reason, and for the other reasons stated above, the Court holds that it is unlikely that JL Beverage will succeed on its likelihood of confusion claim for the JLV mark, for both its reverse and forward confusion claims.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## B.   The JL Lips Mark



Defendants contest the validity of the JL Lips mark, and have petitioned to cancel the mark. (Dkt. no. 32 at ¶¶ 14-25.) However, Defendants do not appear to argue invalidity for the purposes of this Motion.

The Court determines that consumers are unlikely to confuse the JL Lips Mark with Defendants' mark, for largely the same reasons discussed *supra* in Section IV.A. The JL Lips mark is used on the top of Plaintiff's bottle cap and on the back label.

   

v.

  

As alluded to in Section IV(A)(1)(a), the lips image used above is arbitrary.  The JL Lips mark, unlike the JLV mark, is therefore conceptually strong.   However, the Court's analysis *supra* regarding the two marks' commercial strength makes factor one favor Defendants here.

Further, factor three weighs in favor of Defendants because there is even greater dissimilarity between the JL Lips mark and the Pucker Vodka trademark than between the JLV mark and Defendants' mark.  The two marks are used on different parts of the bottle; the JL Lips mark stands alone while the Pucker lips are part of an intricate and colorful logo; the JL Lips mark appears to be decorative while the Pucker lips are colored to denote a particular flavor.  These differences, when added to the differences already

1    discussed *supra* in Section IV(A)(3), demonstrate that the two lips are not used in a

2    similar fashion.  No reasonable consumer would confuse JL Beverage's use of lips

3    imprinted on its bottle cap and in color on the back bottle label with Defendants' use of

4    lips as part of a larger, colorful, busy label that includes Defendants' house name and

5    several other images alongside the lips.  For these reasons, and the reasons stated

6    above regarding the JLV mark, the Court determines that JL Beverage is unlikely to

7    succeed on its trademark infringement claims regarding the JL Lips mark.

8            **C.    Common Law Trademark Claims**

9            JL Beverage also alleges common law trademark infringement against

10   Defendants.  Though not entirely clear from its filings regarding this Motion, it appears as

11   if JL Beverage asserts a common law trademark in its colored lips images and/or its

12   colored labels.

13          The *Sleekcraft* analysis here would not significantly differ from the analysis above

14   regarding the JLV registered trademark. JL Beverage's common law marks are

15   conceptually and visually more similar to the Pucker marks than JL Beverage's

16   registered marks because the concept of coloring the lips portion of the label to

17   correspond to the flavor within the bottle is common to both JL Beverage and Pucker

18   Vodka.  However, this additional similarity does not tip the scales in JL Beverage's favor,

19   because the marks when viewed as a whole – on their respective labels and bottles –

20   are distinct.

21           **D.    Common Law Unfair Competition Claim**

22          "The test for false designation under the Lanham Act, as well as the common-law

23   and statutory unfair competition claims, is whether there was a 'likelihood of confusion.'"

24   *Walter v. Mattel, Inc.*, 210 F.3d 1108, 1111 (9th Cir. 2000) *holding modified by Surfvivor*,

25   406 F.3d 625 (citations omitted).  The Ninth Circuit "has consistently held that state

26   common law claims of unfair competition . . . are 'substantially congruent' to claims

27   made under the Lanham Act."  *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir.

28   1994) (citations omitted).  Therefore, for reasons stated above regarding JL Beverage's

1  trademark infringement claims, JL Beverage is unlikely to succeed on its common law

2  unfair competition claim.

3  **V.      LIKELIHOOD OF IRREPARABLE HARM**

4          To prevail on this Motion, JL Beverage must establish that "remedies available at

5  law, such as monetary damages, are inadequate to compensate for that injury."  *eBay,*

6  547 U.S. at 391. That is, JL Beverage must establish that the harm caused by

7  Defendants cannot be remedied except through injunctive relief.  *See MGM Studios, Inc.*

8  *v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1210 (C.D. Cal. 2007).

9          JL Beverage argues that it will suffer irreparable injury to its reputation and

10  goodwill as long as Defendants are "allowed to continue their infringing activities."  (Dkt.

11  no. 61 at 12.)  Yet this only holds true if Defendants are in fact engaging in infringing

12  activity – if there is a likelihood that consumers will confuse Johnny Love for Pucker (or

13  vice-versa in the case of forward confusion).   But the Court has determined that

14  consumer confusion is unlikely.

15          Defendants assert that JL Beverage waited more than one year after it learned of

16  the alleged trademark infringement to file its Motion, and that this weighs against

17  irreparable harm.  Defendants present evidence that JL Beverage learned of the alleged

18  infringement in February 2011, and Defendants informed JL Beverage that it would not

19  cease using the lips image for its Pucker Vodka in April 2011.  JL Beverage filed its

20  original Complaint in March 2011 and served Defendants in July 2011.  Yet JL Beverage

21  did not file this Motion until February 23, 2012.  "[D]elay before seeking a preliminary

22  injunction implies a lack of urgency and irreparable harm."  *Oakland Tribune, Inc. v.*

23  *Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985).  JL Beverage does not

24  attempt to explain why it delayed bringing this Motion.

25          Because JL Beverage significantly delayed bringing this Motion and because JL

26  Beverage does not demonstrate that it will incur significant non-monetary harm should

27  this case proceed without preliminarily enjoining Defendants, the Court determines that

28  ///

1  JL Beverage has not demonstrated likelihood that it will suffer irreparable harm should

2  the Court deny its Motion.

3  **VI.    BALANCE OF THE HARDSHIPS**

4        "In each case, a court must balance the competing claims of injury and must

5  consider the effect on each party of the granting or withholding of the requested relief."

6  *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542 (1987); *see also Int'l*

7  *Jensen v. MetroSound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993) ("In evaluating the

8  balance of hardships a court must consider the impact granting or denying a motion for a

9  preliminary injunction will have on the respective enterprises.").  An injunction may not

10  issue unless the balance of hardships tips in favor of the moving party.  "[A] court must

11  remain free to deny a preliminary injunction, whatever be the showing of likelihood of

12  success, when equity in the light of all the factors so requires."  *Apple, Inc. v. Samsung*

13  *Elecs. Co., Ltd.*, __ F. Supp. 2d __, 2012 WL 2572037, at *64 (N.D. Cal. July 1, 2012).

14        The Court determines that the balance of the hardships favors Defendants.

15        JL Beverage argues that it has expended substantial "time, money, and other

16  resources" to develop the goodwill and positive reputation surrounding the JLV marks.

17  (Dkt. no. 36 at 22.)  This is no doubt true.  But beyond its arguments regarding likelihood

18  of consumer confusion, JL Beverage does not demonstrate why preliminary injunctive

19  relief is necessary to maintain its brand's positive reputation and goodwill.

20        On the other hand, Defendants argue that they will incur significant hardship were

21  the Court to hold in Plaintiff's favor.  Defendants predict that they will have to expend

22  resources selecting a new product design, changing labels, destroying inventory,

23  changing product advertising, and recalling products and promotional materials.  (Dkt.

24  no. 42 at 28.)  Defendants assert that these steps will harm their business relationships

25  with their suppliers, distributors, and retailers.  (*Id.*)  The Court agrees.  This is an

26  instance where "Plaintiff and Defendants have each spent substantial resources

27  developing their marks, but the hardships Plaintiff may suffer if the status quo is

28  maintained are far inferior to those Defendant would endure if it were required to cease

further commercial use of its mark . . . ."  *Credit One Corp. v. Credit One Fin., Inc.*, 661 F. Supp. 2d 1134, 1141 (C.D. Cal. 2009).

## VII.   PUBLIC INTEREST

Courts "must consider the public interest as a factor in balancing the hardships when the public interest may be affected." *Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988).  "In the trademark context, courts often define the public interest at stake as the right of the public not to be deceived or confused." *Cytosport v. Vital Pharm., Inc.*, 617 F. Supp. 2d 1051, 1081 (E.D. Cal. 2009).  Because the Court determines that the public is unlikely to be confused between the JL Beverage's marks and Defendants' marks, the public interest does not weigh in favor of granting Plaintiff's Motion.

## VIII.   CONCLUSION

IT IS THEREFORE ORDERED that JL Beverage's Motion for Preliminary Injunction (dkt. no. 36) is DENIED.

DATED THIS 25th day of September 2012.

UNITED STATES DISTRICT JUDGE

29