1

2

3

4

5

6               UNITED STATES DISTRICT COURT

7                     DISTRICT OF NEVADA

8                            * * *

9   JL BEVERAGE COMPANY, LLC, a          Case No. 2:11-cv-00417-MMD-CWH
    Nevada limited liability company,

10                                               BENCH ORDER[1]
                           Plaintiff,

11       v.                                        (Redacted)

12  BEAM, INC., a Delaware corporation, *et*
    *al.*,

13
                          Defendants.

14

15  **I.    SUMMARY**

16          This is a trademark infringement action between two beverage producers—Plaintiff

17  JL Beverage Company, LLC ("JL Beverage") and Defendants Beam Inc. and Jim Beam

18  Brands Co. (collectively, "Jim Beam"). The Court held a two-day bench trial. (ECF Nos.

19  265, 266.) For the following reasons, the Court finds that Jim Beam did not infringe JL

20  Beverage's marks and that Jim Beam is not entitled to cancellation of JL Beverage's "JL

21  Lips Mark."

22  **II.   CLAIMS**

23          JL Beverage commenced this action on March 18, 2011, seeking relief for (1)

24  federal trademark infringement under 15 U.S.C. § 1114; (2) false designation of origin and

25  unfair competition under 15 U.S.C. § 1125(a); and (3) common law trademark infringement

26  ///

27  _____

28          [1]This Order has been redacted pursuant to the Court's Order granting Jim Beam's
    Motion to Seal. (ECF No. 278.)

and unfair competition under Nevada law. (ECF No. 1 at 6-9.) JL Beverage based its claims on the "JLV Mark" depicted below:


"JLV Mark"

(*Id.*) The JLV Mark was registered for "vodka" on August 16, 2005, under United States Patent and Trademark Office ("USPTO") Registration No. 2,986,519. (Exh. 1.)

JL Beverage amended its Complaint on December 5, 2011, to assert the same claims based on an additional mark—the "JL Lips Mark"—depicted below:


"JL Lips Mark"

(*See* ECF No. 30 at 5, 9-11.) The JL Lips Mark was registered for "distilled spirits" on October 25, 2011, under USPTO Registration No. 4,044,182. (Exh. 2.) JL Beverage asserts claims of both forward confusion and reverse confusion. (*See* ECF No. 213 at 15.)

Defendants asserted counterclaims that they later amended to state claims for: (1) cancellation of the JL Lips Mark registration as being void ab initio pursuant to 15 U.S.C. §§ 1119, 1064(1), and 1052(f); (2) cancellation of the JL Lips Mark registration for failure to function as a mark pursuant to 15 U.S.C. §§ 1119, 1064(1), and 1052(f); and (3) cancellation of the JL Lips Mark registration based on a likelihood of confusion with Jim Beam's earlier U.S. Registration No. 2,638,476 (the "Beam Lips Mark" depicted below)

pursuant to 15 U.S.C. §§ 1052(d), 1064, and 1119. (ECF No. 168 at 18-21; *see also* ECF Nos. 32, 33 (original counterclaims).)



"Beam Lips Mark"

The Beam Lips Mark was registered for "alcoholic beverages, namely, liqueurs and cordials" on October 22, 2002, under USPTO Registration No. 2,638,476. (Exh. 663 at 2.)

At trial, Jim Beam only offered evidence in support of its third counterclaim.

## III.    FINDINGS OF FACT

### A.    JL Beverage and Johnny Love Vodka

1.    JL Beverage is a Nevada limited liability company with its principal place of business in Henderson, Nevada. (ECF No. 30 at 2.)

2.    JL Beverage manufactured, sold, and promoted a line of vodkas called "Johnny Love Vodka" beginning around June 2005. (ECF No. 265 at 4-5, 61-62.)

3.    Liquor manufacturers must go through a multi-step process colloquially known as the "three-tier distribution" system for its products to reach consumers. Under the three-tier distribution system, the manufacturer must negotiate with, and then sell (and ship) its product to third-party liquor distributors (or, in the case of a "Control State," to the state-controlled equivalents), and it is the distributor that then sells the product to retailers who, in turn, sell it to consumers. (ECF No. 266 at 84-85.)

4.    JL Beverage stopped brand operations in 2008 but continued to make sales through 2011. (ECF No. 265 at 188-90.) JL Beverage did not introduce credible evidence of any sales that took place after 2011. (*Id.*)

5.    Johnny Love Vodka comes in five flavors (premium (unflavored), apple, tangerine, aloha, and passion) and four sizes (50 ml, 200 ml, 750 ml, and 1.75 L). (*See id.* at 23-25.)

///

3

6.     On bottles of Johnny Love Vodka, the JL Lips Mark appears on the front label, the back label, and the bottle top security seal. (*Id.* at 28-29.) The color of the JL Lips Mark on the front label varies depending on the flavor of the vodka, with green denoting apple, orange denoting tangerine, and so on. (*See id.* at 29-30.)



7.     Johnny Love Vodka has been sold at retail stores in the range of $0.99 to $2.99 for the 50 ml bottle; $4.99 to $5.99 for the 200 ml bottle; $14.99 to $24.99 for the 750 ml bottle; and approximately $29.99 for the 1.75 L bottle. (*Id.* at 33-34.)

8.     Consumers do not refer to Johnny Love Vodka as "the lip vodka." JL Beverage offered evidence at trial that consumers refer to Johnny Love Vodka as "the lip vodka," but the Court did not find this evidence credible. (*See id.* at 238.) The manager of JL Beverage, Thomas J. Diab, testified that consumers called Johnny Love Vodka products "the lip vodka" but could only identify one instance of a writing—a newspaper article—that referred to Johnny Love Vodka as "the lip vodka" when pressed on cross-examination. (*Id.* at 238-39.) JL Beverage did not introduce any additional evidence that consumers referred to Johnny Love Vodka as "the lip vodka."

### 1.     Development

9.     A restaurant owner and bartender named Johnny Metheny created the Johnny Love line of vodkas some time before 2005. (*See id.* at 5.)

10.     JL Beverage purchased the Johnny Love brand from Metheny in 2005 for approximately $940,000. (*Id.* at 17.)

### 2. Marketing

11.    JL Beverage spent roughly $477,000 on marketing and advertising for Johnny Love Vodka over the life of the brand. (*See id.* at 201.)

12.    Some of these funds were used to hire salespeople who solicited distributors. (*Id.* at 104.)

13.    Some of these funds were also used for one-time sponsorships—specifically mentioned at trial were sponsorships of the 2005 Radio Music Awards, a dune buggy race, an auto race called "24 Hours of Daytona," and the 2010 Miss USA pageant. (*Id.* at 104-05.) 24 Hours of Dayton was televised worldwide; the 2010 Miss USA pageant was televised nationally; and the dune buggy race was televised on a smaller scale. (*Id.* at 107-08.)

14.    Consumers exposed to JL Beverage's logo and marketing materials during the sponsorship events probably would not remember it. While Mr. Diab (the manager of JL Beverage) testified that consumers who saw the JLV Mark on the media wall at the Miss USA pageant or on a race car in 2008 would remember it six to nine years later (*id.* at 236-38), the Court finds that this testimony is not credible. The JLV Mark was one of many logos featured in both of those contexts, and it was not set apart from the other logos in any meaningful way. For instance, the JLV Mark did not appear to be a larger size than the other logos. (*See* Exh. 32A at JLSUPP000139 (photograph of race car in 24 Hours of Daytona), JLSUPP000146 (media wall from 2010 Miss USA pageant).)

15.    JL Beverage spent $2,347 advertising in traditional media such as newspapers, magazines, and television commercials. (*See* ECF No. 265 at 232.)

16.    An image of a Johnny Love Vodka bottle has been featured on the home Facebook page of "I Love Vodka" continuously since 2015 or 2016, and that Facebook page has been liked by over 550,000 Facebook users. (*Id.* at 109-10; Exh. 32A at JLSUPP000151.) The Johnny Love Vodka bottle was featured as a result of business dealings JL Beverage had with the owner of the Facebook page. (ECF No. 265 at 109-10.)

17.     JL Beverage entered a business relationship with Alaska Airlines in or around 2008 that lasted for about a year. (*Id.* at 87-88, 99-100.) JL Beverage sold Premium and Aloha flavors of Johnny Love Vodka to Alaska Airlines in the 50 ml and 750 ml sizes. (*Id.* at 88.) The larger, 750 ml bottles were kept in "in-airport boardrooms." (*Id.*) JL Beverage sold between eight thousand and ten thousand cases[2] of the 50 ml bottles to Alaska Airlines. (*Id.* at 89.) Alaska Airlines featured Johnny Love Vodka on recipe cards in the seat-back pocket of its airplanes. (*Id.* at 90; *see also* Exh. 32A at JLSUPP000136.) At the time that JL Beverage dealt with Alaska Airlines, the airline had approximately 400 flights a day. (*Id.* at 91.)

18.     Consumers purchased Johnny Love Vodka at retail stores, restaurants, and bars. (*Id.* at 32.)

19.     JL Beverage continuously has held a Federal Basic Alcohol Permit for nationwide use since 2005. (*Id.* at 61-62.)

20.     JL Beverage established that the Johnny Love Vodka product line was available for sale in all fifty states but did not establish actual sales in all fifty states. JL Beverage established actual sales only in the following states and regions: Alaska, Arizona, Arkansas, California, Colorado, Delaware, District of Columbia, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Maine, Massachusetts, Michigan, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, Washington, West Virginia, Wisconsin. (ECF No. 265 at 42 (listing Virginia, Pennsylvania, North Carolina, Idaho); *id.* at 49 (listing West Virginia, Montana, Florida, Tennessee, Washington); *id.* at 54 (listing Maine and Michigan); *id.* at 59 (listing New Hampshire); Exh. 3 (identifying the remaining states listed).)

///

///

---

[2]Each case contained 120 bottles. (ECF No. 265 at 89.)

21.     Regarding the quantity of sales, JL Beverage sold hundreds or thousands of cases to distributors in these states, except for Maine, New Hampshire, Rhode Island, and Virginia, where JL Beverage sold fewer than 350 cases.[3] (ECF No. 265 at 59-61.)

22.     Consumers technically were still able to purchase Johnny Love Vodka at the time of trial (*see, e.g.*, ECF No. 266 at 262-63), though JL Beverage did not produce credible evidence of sales to distributors after 2011 (*see* ECF No. 265 at 188-90).

### 3.     Profitability

23.     JL Beverage never earned profit from its business activities. (ECF No. 265 at 162-65; *see also* Exhs. 521-26.)

24.     JL Beverage's lifetime sales of Jonny Love product have totaled less than $2.6 million. (ECF No. 265 at 138-39.)

25.     By 2009, JL Beverage's revenue from sales of Johnny Love Vodka had dropped to $161,000, representing the shipment of 413 cases of product. (*See* ECF No. 265 at 170-76, 186; Exh. 525; Exh. 25 at 3.)

26.     Over the next two years, sales of Johnny Love Vodka continued to fall, with JL Beverage selling 228 cases of product in 2010 and 112 cases in 2011. (*See* ECF No. 265 at 176-77; Exh. 25 at 3.)

27.     JL Beverage did not produce credible evidence of sale of any Johnny Love products after 2011. (ECF No. 265 at 188.)

28.     JL Beverage suspended Johnny Love brand operations in 2008. (ECF No. 265 at 188-90; Exh. 25 at 2.)

29.     JL Beverage did not introduce evidence that it restarted Johnny Love Vodka operations at any time after 2008.

///

///

---

[3]Each case of the 750 ml size of Johnny Love Vodka contained 12 bottles; each case of the 200 ml size contained 48 bottles; and each case of the 50 ml size contained 120 bottles. (ECF No. 265 at 58.)

## B.  Jim Beam and Pucker Vodka

30.    Jim Beam comprises Delaware corporations with a principal place of business in Deerfield, Illinois. (ECF No. 32 at 3.) Jim Beam promotes and sells a line of flavored liqueurs and a line of flavored vodka products under the name Pucker through the three-tier distribution system. (*See, e.g.*, ECF No. 47 at 2;[4] ECF No. 47-1 at 2-3; ECF No. 47-2 at 2-3; ECF No. 266 at 108-09.) Jim Beam launched its Pucker vodkas nationwide in April 2011. (Deposition of Kim Washington ("Washington Dep.") at 27, 66; *see also* Deposition of Maria Martin ("Martin Dep.") at 44.[5])

### 1.  Development

31.    Jim Beam has sold a popular line of flavored liqueurs (prior to the launch of Pucker Vodka) in the United States that goes by the name "Pucker" since 1996. (ECF No. 266 at 102.)

32.    The trade dress used with Pucker liqueurs has always featured both the Pucker name and a design that depicted a set of "open lips." (*Id.* at 102-07, 110, 171; Exhs. 885, 952, 1121.) The color of the lips that appear on the Pucker products corresponds to the flavor of the liqueur, as shown below:



(ECF No. 266 at 381-85.)

_____

[4]The parties stipulated to the admission of the Declaration of Claudia Stangle (and accompanying Exhibits 1-3, 6-31, and 43-44 (ECF Nos. 47-55)) as well as the January 23, 2018 Declaration of Liberty Quan (and accompanying Exhibits 1-103) prior to trial. (ECF Nos. 217-18.) Both declarations and accompanying exhibits were admitted into evidence at trial. (ECF No. 266 at 78-79.)

[5]The Court admitted Jim Beam's designations of and exhibits to the depositions of Kim Washington and Maria Martin into evidence at trial. (ECF No. 266 at 78-79.)

33.     In the years leading up to the events in this case, Jim Beam was selling, on average, about 500,000 standard (nine-liter) cases of Pucker liqueur products a year. (ECF No. 266 at 103.) Jim Beam continues to sell Pucker-branded liqueurs (featuring lips) to this day. (*See id.* at 110.)

34.     Jim Beam began work on a project to extend the goodwill consumers associated with the Pucker name and trade dress for flavored liqueurs (including the use of lips in colors that correspond to flavors) to a new line of flavored vodkas in early 2010. (*Id.* at 43-45, 116-20, 135-36; *see also* Exhs. 798 (presentation materials containing early ideas about Pucker Vodka), 1040 (summary supporting the development of Pucker Vodka); Washington Dep. at 14-18, 25-27; Martin Dep. at Exh. 11 (packaging design brief).)

35.     Jim Beam initially sold Pucker liqueurs under a license from third-party Koninklijke de Kuyper, B.V. ("De Kuyper"). (*See* Martin Dep. at 34, 36; ECF No. 266 at 37.)

36.     Jim Beam purchased the Pucker brand and intellectual property assets from De Kuyper in December 2010 for ███████ dollars even though Jim Beam already had a ███████ license to use the mark because Jim Beam decided that it wanted to own the entirety of the Pucker brand. (Martin Dep. at 34, 36-37; *id.* at Exh. 20; ECF No. 266 at 57-59, 65, 102-03, 204; Exh. 53.)

37.     Among the rights associated with the Pucker brand that Beam acquired from De Kuyper were the three federal trademark registrations depicted below:

U.S. Reg. No. 2535369     **PUCKER**

U.S. Reg. No. 2665405     

U.S. Reg. No. 2638476     

(ECF No. 47 at 2-3; *see also* ECF No. 266 at 355; Exh. 663.)

38.     Jim Beam wanted the Pucker Vodka line to look distinct from the Pucker liqueur line while at the same time extending the goodwill consumers associated with the Pucker name and trade dress (including the use of lips in various colors) to the vodka line. (*See* ECF No. 266 at 43-45; *see also* Washington Dep. at 14, 25-27; Martin Dep. at Exh. 11.)

39.     To accomplish that task, Jim Beam retained an outside design firm named Libby, Perszyk, Kathman Inc. ("LPK"), and charged it with creating the packaging for the new line of flavored vodkas. (*See* Washington Dep. at 14, 25-27; Martin Dep. at Exh. 11.)

40.     Kimberly Washington oversaw the Pucker Vodka project as Jim Beam's Senior Director for Vodka, Cognac, and Gin, and provided the LPK design team with express project parameters in April 2010. (Washington Dep. at 14-18, 25-27; *see also* Martin Dep. at Exh. 11.)

41.     Among the project "mandatories" she provided was the requirement that the new packaging design "include the name 'Pucker' and a representation of the lips from the current Pucker label." (Martin Dep. at Exh. 11; Washington Dep. at 14-18, 25-27.)

42.     More specifically, Ms. Washington instructed LPK to consider both "a close-in extension of the current [Pucker] label equity into Vodka" as well as "options that push further out . . . and may be more appropriate in the Vodka space." (Martin Dep. at Exh. 11; *see also* Washington Dep. at 25-26.) The designers were also told to make sure that the new design for vodka "fit" with the existing Pucker liqueur design. (*See* Martin Dep. at Exh. 11.)

43.     Ms. Washington also identified the "[c]ompetitive targets" for the new Pucker Vodka product. She told LPK that UV, Three Olives, Svedka, Pinnacle, and Ursus were competing brands. (Martin Dep. at Exh. 11; *see also* Washington Dep. at 25-26.)

44.     Ms. Washington did not refer to JL Beverage or Johnny Love Vodka in the project parameters. (*See generally* Martin Dep. at Exh. 11; *see also* Washington Dep. at 25-26.) Rachael Roberts, the head of Jim Beam's cordials products (including Pucker), was unaware of JL Beverage and Johnny Love Vodka prior to this litigation. (ECF No. 266

at 355, 405.) The LPK team had no knowledge of JL Beverage or Johnny Love Vodka and did not see JL Beverage's lips design when working on the Pucker Vodka project. (Martin Dep. at 90-92; *id.* at Exh. 14.)

45.　Although one former Jim Beam employee (Emily Johnson) knew Mr. Diab, Ms. Johnson did not participate in the design, selection, or adoption of the Pucker Vodka trade dress. (Deposition of Emily Johnson ("Johnson Dep.") at 13;[6] Martin Dep. at 48; ECF No. 265 at 245-49; Exhs. 7, 44.)

46.　While Ms. Johnson exchanged emails with Mr. Diab about JL Beverage's sales volume in March 2010, those emails constituted cordial, professional communications between acquaintances that are unrelated in any substantial way to this litigation. (Exhs. 7, 44; ECF No. 265 at 75-78.)

47.　For some designs, LPK obtained a graphic from a "stock art" agency for which it could later secure the right to use through a license. (*See* Martin Dep. at 44-45.)

48.　LPK presented its top packaging designs to Ms. Washington and her team at Jim Beam for review and preliminary approval; those initial design options were then narrowed down to the top six LPK packaging ideas (below), all of which Jim Beam forwarded to an outside research firm (MotorBrains) for marketplace evaluation in mid-2010:



(Washington Dep. at 40-42, 45-46, Exh. 34; Martin Dep. at Exh. 18.)

///

---

[6]The Court admitted Jim Beam's designations of and exhibits to the deposition of Emily Johnson into evidence at trial. (ECF No. 266 at 78-79.)

49.     Of the designs depicted above, consumers were most responsive to Designs 72 and 173, with Design 72 having the slight edge, based on consumer focus groups conducted in late June and early July 2010. (Washington Dep. at 47; Martin Dep. at Exh. 19.)

50.     Jim Beam sent the designs to outside counsel with the primary goal of ensuring they did not infringe any other party's rights. (Martin Dep. at 21-22.) This is standard practice at Jim Beam. (ECF No. 266 at 101.) Jim Beam's practice is to search the entire marketplace (competitors or not) when clearing potential marks and packaging designs. (*Id.* at 164.)

51.     In mid-August 2010, Claudia Stangle, an attorney at Leydig, Voit & Mayer, obtained and reviewed a trademark clearance search report for lips that had been performed by an outside search firm (Thomson Compumark). Around that time, Ms. Stangle also reviewed clearance searches she had received relating to the two possible bottle shapes and the fourteen different potential bottle closure designs. (ECF No. 47 at 1, 4-5; *see also* ECF No. 49; ECF No. 49-1; ECF No. 49-2; ECF No. 49-3.)

52.     The search report that Ms. Stangle reviewed referenced forty third-party uses of lips in connection with alcoholic beverages. For example, the search report included then-U.S. Trademark Serial No. 77-579,717 (now U.S. Trademark Registration No. 3,902,479) which covers the below lips design mark in International Class 33 for a prepared alcoholic cocktail:



(ECF No. 47 at 4; ECF No. 49 at 6; First Deposition of Thomas J. Diab ("First Diab Dep.") at Exh. 31.[7])

---

[7]The Court admitted Defendant's previously noticed designations of, and exhibits to, Mr. Diab's first deposition. (ECF No. 266 at 78-79.)

53.     Mr. Diab testified in his first deposition that the lips design depicted above is just as similar to the Johnny Love lips as the lips that appear on Pucker Vodka. (First Diab Dep. at 266-68; *id.* at Exh. 31.)

54.     The JLV Mark appeared among the results in the search report, but the JL Lips Mark did not appear among the results because its underlying application was not filed until after Ms. Stangle obtained the search report. (ECF No. 47 at 4-5.)

55.     Ms. Stangle sent Jim Beam an opinion letter about the availability of the LPK lips designs on August 19, 2010, after completing her review of the trademark search. (*See* ECF No. 47 at 5.) Ms. Martin received and reviewed the letter from Ms. Stangle in her capacity as the person at Jim Beam responsible for coordinating with outside counsel. (Martin Dep. at 9-10, 91-92.)

56.     Ms. Martin did not look at or see the JLV Mark among the trademarks on the search report that Ms. Stangle sent. (Martin Dep. at 91-92.)

57.     Ms. Martin relayed the pertinent parts of the clearance opinion to Ms. Washington (head of the Pucker Vodka team) with a conclusion that the design was cleared for adoption. Ms. Martin did not forward the search report itself. (Martin Dep. at 112-13.)

58.     Jim Beam created two designs based on the top LPK designs (Designs 72 and 173) called "Glitter" and "2 Lips," depicted below. These were the two final concepts Jim Beam was considering in August 2010.




"Glitter" Design          "2 Lips" Design

(Washington Dep. at 50-51, Martin Dep. at Exh. 21.)

59.     Jim Beam then sent those two bottle designs to another market research company (Nielsen), this time to conduct quantitative consumer market research. (*See* Washington Dep. at 49; *see also* Martin Dep. at Ex. 21.)

60.     Nielsen reported to Jim Beam that consumers preferred the lips of the "2 Lips" bottle design to those of the "Glitter" design. This could be seen through a "Heat Map" the researchers generated, which demonstrated the aspects of the designs consumers liked the most:



(*See* Martin Dep. at Exh. 21.)

61.     The research suggested that certain aspects of the "Glitter" design resonated with consumers as well. For example, the "fruit images" were well received and were considered "the main driver of appeal." (*See* Martin Dep. at Exh. 21.) By contrast, the use of lips on both the cap and the label of the "2 Lips" design was considered "overkill" and strongly disliked. (*Id.*)

62.     By November 2010, Jim Beam had settled on the final Pucker design, which reflected feedback received through marketplace testing and thus included elements from both the "Glitter" and "2 Lips" designs. For example, the label included the preferred lips from the "2 Lips" bottle (which were from LPK Design No. 72), but also included prominent "fruit images" similar to what consumers liked with "Glitter":

///

///



"Glitter"    "2 Lips"

(Washington Dep. at 62-63; *see also* Martin Dep. at Exh. 21; Washington Dep. at Exh. 35.)

63.     Jim Beam commissioned additional research for its new line of flavored vodkas beyond these design studies. For example, in August 2010, Jim Beam hired Perryam & Kroll to conduct research on flavors that could be used with the Pucker line. Nielsen conducted further research as well, generating a final report in November 2010. (*See* Washington Dep. at 51-52, 54-55; Johnson Dep. at Exh. 30; *see also* Washington Dep. at 68 (discussing September 2010 Nielsen report); *id.* at Exh. 38 (Nielsen report); Martin Dep. at Exh. 22 (Nielsen report).)

64.     After settling on the bottle design, Jim Beam worked with a separate research firm (Good Run) to test potential advertising campaigns. The initial ad campaigns were designed by yet another outside vendor, an advertising agency called Berlin Cameron. Advertising testing continued through several rounds. (*See* Washington Dep. at 33, 61-65; *id.* at Exhs. 35-36.)

65.     Jim Beam began producing Pucker flavored vodkas in March 2011. That same month, Jim Beam also filed for trademark protection on, among other things, the "lips" design that LPK had provided for use. (Washington Dep. at 63; Martin Dep. at 44.)

66.     When it filed its "lips" trademark applications, Jim Beam believed that its use of the lips did not violate the rights of any other party. (Martin Dep. at 44-45.)

1  67.    Jim Beam withdrew the application when it learned that the lips selected by
2  LPK were "stock art" from iStockphoto LP. (*Id.* at 27-31.)

3  68.    Jim Beam launched its Pucker flavored vodkas nationwide in April 2011.
4  (Washington Dep. at 27, 66; Martin Dep. at 44.)

5  69.    Over the years, Jim Beam has advertised and promoted its line of Pucker
6  vodkas nationally through television commercials, print advertisements, in-store and on-
7  premises promotions (such as in restaurants and bars), digital advertising, and other ways.
8  (ECF No. 266 at 40-41.) For example, television commercials for Pucker have aired on
9  BET, Bravo, FX, Lifetime, TBS, TLC, TNT, and other channels; and print advertisements
10 have run in magazines such as Cosmopolitan, Elle, Entertainment Weekly, Marie Claire,
11 OK! Weekly, People StyleWatch, and Us Weekly, collectively exposing millions of
12 consumers nationwide to the Pucker vodka brand. (*See id.* at 137-40, 142-152; Exhs. 883,
13 1161.)

14 70.    Since it launched Pucker Vodka in April 2011, Jim Beam has sold more than
15 560,000 cases of product in the United States. (*See* Exh. 1158.)

16     **2.    Profitability**

17 71.    Jim Beam had never earned a profit on sales of Pucker Vodka at the time of
18 trial. (ECF No. 266 at 209.)

19 72.    Jim Beam has lost approximately ███████████ dollars on the Pucker
20 Vodka brand. (*Id.* at 206.)

21 **C.    Origins of Dispute**

22 73.    On February 15, 2011, Mr. Diab received an email from the chief
23 administrator of the North Carolina Alcoholic Beverage Control Commission forwarded by
24 a distributor stating that Pucker Vodka "looks a lot like" Johnny Love Vodka. (ECF No. 265
25 at 63-64, 66-67; Exh. 6.)

26 74.    JL Beverage delivered a cease-and-desist letter to Jim Beam on March 18,
27 2011. (ECF No. 265 at 72-73; Exh. 4.) Jim Beam denied that there could be any likelihood
28 of confusion. (ECF No. 265 at 74-75; Exh. 5.)

75.    The USPTO filed and sent Jim Beam an initial office action dated June 10, 2011, rejecting one of Jim Beam's trademark applications on the basis that Jim Beam's proposed bottle design was non-distinctive product packaging because "the shape of the bottle and cap are not capable of creating a commercial impression distinct from the accompanying wording and design of a lip because consumers will focus on these arbitrary words and designs to determine the source of the bottle." (Exh. 17 at 39 (marked JLBEV000104).)

76.    The USPTO also determined in that office action that the "the lip design is a registrable and inherently distinctive feature of the mark . . . . Because the lip design creates a distinct commercial impression it may not be excluded from the mark." (*Id.* at 3 (page not otherwise marked).)

77.    The USPTO filed and sent Jim Beam two memoranda on June 20, 2011, granting JL Beverage's letters of protest because the USPTO "determined that the evidence submitted by the protester is relevant." (Exh. 16 at 29 (marked JLBEV000071); Exh. 17 at 35 (marked JLBEV000100).)

78.    JL Beverage has taken steps to prevent companies other than Jim Beam from infringing JL Beverage's rights in and to the JLV Mark and the JL Lips Mark, including by filing oppositions with the USPTO to pending trademark applications, and by sending cease-and-desist letters as recently as April 2016. (Exhs. 20, 21, 22, 24, 28, 29, 30, 31, and 34.)

## IV.    CONCLUSIONS OF LAW

### A.    Likelihood of Confusion

"The touchstone for trademark infringement is likelihood of confusion, which asks whether a 'reasonably prudent' marketplace consumer is 'likely to be confused as to the origin of the good or service bearing one of the marks.'" *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 431 (9th Cir. 2017) (quoting *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1214 (9th Cir. 2012)). There are two types of confusion: forward and reverse. "Forward confusion occurs when consumers believe that goods

bearing the junior mark came from, or were sponsored by, the senior mark holder." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1106 (9th Cir. 2016). "Reverse confusion, on the other hand, 'occurs when consumers dealing with the senior mark holder believe that they are doing business with the junior one.'" *Id.* (quoting *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir.2005)).

JL Beverage is pursuing theories of both forward and reverse confusion. (ECF No. 213 at 15.) As a result, the Court, after considering how consumers interact with and see the products in the marketplace, "must determine whether a reasonable consumer interested in purchasing vodka or flavored vodka could think that JL Beverage produces Pucker or that Pucker Vodka is the same product as Johnny Love Vodka (forward confusion), or could think that the Beam Defendants produce Johnny Love Vodka or that Johnny Love Vodka is the same product as Pucker Vodka (reverse confusion)." *JL Beverage Co., LLC v. Beam, Inc.*, 899 F. Supp. 2d 991, 998 (D. Nev. 2012).

To determine whether a likelihood of forward or reverse confusion exists, courts apply the eight *Sleekcraft* factors: (1) the strength of the mark; (2) proximity or relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion of the product lines. *JL Beverage*, 828 F.3d at 1106 (citing *AMF Inc. v Sleekcraft Boats*, 599 F.3d 341, 348-49 (9th Cir. 1979)).

The *Sleekcraft* factors are not the only factors a court may consider in a likelihood of confusion analysis. Rather, they constitute "guideposts . . . and are adaptable to specific cases." *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 874 (9th Cir. 2014).

The Court finds there is no likelihood of confusion between the JLV Mark or the JL Lips Mark and Pucker Vodka. Critically, the trade dress of Johnny Love Vodka is substantially different from the trade dress of Pucker Vodka. In addition, consumers exercise some care when selecting alcoholic beverages, and JL Beverage did not adduce

persuasive evidence at trial that Jim Beam acted with intent to capitalize on the good will of Johnny Love Vodka or to flood the market with a similar product that would push JL Beverage out of business. JL Beverage also did not introduce persuasive evidence of commercial strength of its marks. While JL Beverage's marks are conceptually strong, and the products at issue are certainly related, these factors do not outweigh the others to compel a finding that there is a likelihood of confusion.

### 1. Strength

"A mark's strength is 'evaluated in terms of its conceptual strength and commercial strength.'" *JL Beverage*, 828 F.3d at 1107 (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000)). How "strength" is assessed varies depending on whether one is conducting a "forward" or a "reverse" confusion analysis.

"In the usual forward infringement case, the court determines whether the junior user is palming off its products as those of the senior user. Consequently, for JL Beverage's claim of forward confusion, we evaluate the conceptual and commercial strength of the JLV Mark and JL Lips Mark to determine whether a consumer interested in purchasing vodka would be confused into thinking that JL Beverage produces Jim Beam's Pucker Vodka, or that Johnny Love Vodka is the same product as Pucker Vodka." *JL Beverage,* 828 F.3d at 1107 (internal citations, quotation marks, and alteration omitted).

However, "in claims of reverse confusion, the question is 'whether consumers doing business with the senior user might mistakenly believe that they are dealing with the junior user.' As a result, the court evaluates the conceptual strength of JL Beverage's marks and compares it to the commercial strength of Jim Beam's trade dress design." *Id.* (quoting *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129–30 (9th Cir. 1998)). Therefore, and in sum, the Court must consider here: "(1) the conceptual strength of the JLV mark, for the purposes of both forward and reverse confusion; (2) the commercial strength of the JLV mark, for the purposes of forward confusion; and (3) the commercial strength of the Pucker Vodka mark, for the purposes of reverse confusion." *JL Beverage*, 899 F. Supp. 2d at 999.

### a. Conceptual Strength of JL Beverage's Marks

"A mark's conceptual strength 'depends largely on the obviousness of its connection to the good or service to which it refers.'" *JL Beverage*, 828 F.3d at 1107 (quoting *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1032–33 (9th Cir. 2010)). Meanwhile, the obviousness of a mark's connection to the goods or services turns on whether it is arbitrary, fanciful, suggestive, descriptive, or generic. *See id.* (citing *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011)).

"Arbitrary and fanciful marks, which employ words and phrases with no commonly understood connection to the product, are the two strongest categories, and 'trigger the highest degree of trademark protection.'" *JL Beverage*, 828 F.3d at 1107 (quoting *Surfvivor*, 406 F.3d at 631). Suggestive marks are just that—they "suggest a product's features and require consumers to exercise some imagination to associate the suggestive mark with the product." *Id.* "Descriptive marks define a particular characteristic of the product in a way that does not require any imagination," and generic "marks" are not marks at all; they are words that "describe the product in its entirety" and "are not entitled to trademark protection." *Id.*

Considering the JLV Mark first, Jim Beam concedes that it is arbitrary. (ECF No. 267 at 33.) Thus, the Court will consider its commercial strength below. *JL Beverage*, 828 F.3d at 1107 ("After identifying whether a mark is generic, descriptive, suggestive, arbitrary, or fanciful, the court determines the mark's commercial strength.").

Turning to the JL Lips Mark, JL Beverage argues that the mark is arbitrary because it does "not suggest or describe any characteristic or quality of the vodka." (ECF No. 270 at 25.) Defendant argues that the design has weak conceptual strength because there is no evidence that it "functions as a source identifier." (ECF No. 267 at 33.)

The Court finds that the JL Lips Mark is suggestive—not arbitrary or fanciful—because the JL Lips Mark suggests at least three characteristics of the vodka. First, the color of the JL Lips Mark suggests the flavor of the vodka the bottle contains. *See JL*

*Beverage*, 828 at 1107-08 ("Reasonable jurors, viewing the Mark in its entirety, could conclude that the Mark is suggestive because they must use their imaginations to connect the color of the lips to the vodka flavor."). Second, the JL Lips Mark suggests that the vodka is appealing from the point of first contact with the mouth—the lips. Third, the JL Lips Mark connotes sexuality—it resembles the imprint left by a lipstick-slathered kiss. This may lead some consumers to believe that Johnny Love Vodka will imbue them with sexual prowess.

Jim Beam's argument that the JL Lips Mark does not serve as a source identifier does not directly address the conceptual strength prong of this inquiry. Jim Beam has not identified any authority to show that a mark's function as a source identifier determines the degree of its conceptual strength.

### b. Commercial Strength of JL Beverage's Mark

A mark's commercial strength "is based on actual marketplace recognition." *JL Beverage*, 828 F.3d at 1107. Commercial strength thus "refers to [a mark's] degree of recognition in the minds of the relevant customer class." *JL Beverage*, 899 F. Supp. 2d at 1001.

To measure commercial strength, courts typically look at the same factors used in a "secondary meaning" analysis, including sales activities, advertising expenses, and unsolicited media mentions. *See adidas-Am., Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1056–57 (D. Or. 2008); *Guess?, Inc. v. Tres Hermanos*, 993 F. Supp. 1277, 1280 (C.D. Cal. 1997) (quoting *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1179 (9th Cir.1988)) ("Strength of the mark is demonstrated by 'extensive advertising, length of time in business, public recognition and uniqueness.'").

JL Beverage's evidence does not show extensive sales or advertising, especially for a national market. JL Beverage spent less than $500,000 over the life of the brand promoting Johnny Love Vodka, and many of these expenditures were for one-time sponsorship events with limited audiences. (*See* ECF No. 265 at 104-05, 107-08, 201.) Moreover, JL Beverage sales—nationwide, over the life of the brand—totaled only $2.6

million. (*Id.* at 138-39.) For a brand and product that claims a national presence, these figures do not show commercial strength. *Cf. Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1179 (9th Cir. 1988) ("Evidence of the strength of Century 21's mark includes the fact that it has expended several million dollars in advertising real estate services rendered in connection with the 'Century 21' mark, and that the mark has been used in connection with real estate sales in excess of one billion dollars.").

In addition, the vast majority of JL Beverage's advertising and sales occurred before Pucker Vodka even hit the market. JL Beverage discontinued its advertising and promotional efforts in 2008, three years before Jim Beam launched Pucker Vodka in 2011. (*See* ECF No. 265 at 188-90; Washington Dep. at 27, 66; Martin Dep. at 44.) In addition, JL Beverage had only minimal sales in 2011 and did not produce credible evidence of any sales after 2011. (ECF No. 265 at 188-90.) Thus, whatever marketplace recognition JL Beverage possessed at the time of its relatively modest promotional efforts had likely waned to some degree by the time Pucker Vodka launched.

JL Beverage did not introduce evidence of unsolicited media mentions. While JL Beverage introduced evidence that an image of a Johnny Love Vodka bottle has been featured on the home Facebook page of "I Love Vodka" continuously since 2015 or 2016, and that Facebook page has received "likes" from over 550,000 Facebook users (ECF No. 265 at 109-10; Exh. 32A at 16 (marked JLSUPP000151)), the Johnny Love Vodka bottle was featured as a result of business dealings JL Beverage had with the owner of the Facebook page. (ECF No. 265 at 109-10.)

### c. Commercial Strength of Jim Beam's Trade Dress Design

JL Beverage concedes that Jim Beam's trade dress design is "relatively strong" (ECF No. 270 at 25.) However, the parties dispute whether this fact weighs in favor of Jim Beam or JL Beverage. JL Beverage argues that for a claim of reverse confusion, evidence that the junior mark (Jim Beam's) is well-known suggests greater likelihood of confusion because it increases the likelihood that consumers dealing with the senior mark holder (JL Beverage) will believe that they are doing business with the junior one. (*Id.*) Jim Beam

argues that its use of the Beam Lips Mark dates back twenty years, making it the "senior mark." (ECF No. 267 at 29-29.) However, the Beams Lips Mark looks substantially different from the lips that appear on the Pucker Vodka bottles. The Beam Lips Mark is heavily stylized, whereas the lips on the Pucker Vodka bottles are more naturalistic, closely resembling an actual lipstick print. (See depictions below.) Consequently, the Court finds that the depiction of lips that appears on the Pucker Vodka bottles is junior to both of JL Beverage's marks.

   

Beam Lips Mark        Pucker Vodka Lips

Nevertheless, in light of the weak commercial strength of JL Beverage's marks, the commercial strength of Jim Beam's trade dress design does not generate a likelihood of confusion.

### 2. Relatedness

The proximity or relatedness of the goods or services at issue is determined by whether the goods or services are: "(1) complementary; (2) sold to the same class of purchasers; and (3) similar in use and function." *La Quinta*, 762 F.3d. at 875 (quoting *Network Automation*, 638 F.3d at 1151). Here, the products are related—they are both flavored vodkas that are sold to consumer through retailers who have been supplied by distributors (the parties' end consumers).

### 3. Similarity

"Similarity of the marks 'has always been considered a critical question in the likelihood-of-confusion analysis.'" *JL Beverage*, 828 F.3d at 1109 (quoting *GoTo.com*, 202 F.3d at 1205).

Under this *Sleekcraft* factor, courts "compare the two marks in terms of sight, sound, and meaning, considering the marks 'as a whole, as [they] appear in the marketplace.'" *La Quinta*, 762 F.3d at 875 (alteration in original) (quoting *M2 Software,*

*Inc. v. Madacy Entm't*, 421 F.3d 1073, 1082 (9th Cir. 2005)). When considering the degree of similarity between two marks, however, it is important that courts "analyze each mark within the context of other identifying features," such as the trade dress of the product as sold in the marketplace. *See JL Beverage*, 899 F. Supp. 2d at 1002.

Furthermore, when determining and assessing marketplace similarity, courts must compare the products' respective trade dress in their entireties. *See, e.g., GoTo.com*, 202 F.3d at 1206 ("[M]arks must be considered in their entirety and as they appear in the marketplace."); *Playmakers, LLC v. ESPN, Inc.*, 297 F. Supp. 2d 1277, 1283 (W.D. Wash. 2003), *aff'd*, 376 F.3d 894 (9th Cir. 2004) ("[W]hat is critical is the *overall* appearance of the mark as used in the marketplace, not a deconstructionist view of the different components of the marks.").

The Court finds significant differences between the marks when evaluated in the context of their entire trade dress, as depicted below.



First, the bottle shapes are different. JL Beverage uses a standard stock wine bottle with a long neck, whereas Jim Beam uses a bespoke cylindrical bottle. (ECF No. 266 at 135.)

The bottle closures also are different. JL Beverage uses a traditional foil-covered cap in a silver color, similar to coverings for wine bottles. Jim Beam uses specially-designed large plastic caps for its Pucker bottles, and the caps are color-coded to correspond to the vodka flavor and feature a grooved wave pattern running across them.

The product labels also are different. JL Beverage's label is silver with minimalist wording in black lettering. The labels for Pucker Vodka, by contrast, feature purple and white lettering offset against a brightly-colored background that denotes the product flavor (for example, purple for grape) and which includes a white portion in the middle to highlight the depiction of lips. The Pucker labels also include colored inkblots (also color-coded), not found on Johnny Love Vodka. The labels also use different fonts.

The "lips" images, including their thickness, curvature, and placement, are different too. JL Beverage's trade dress uses the image of a full, rounded set of lips (showing few creases and shaped as if someone were saying "oh") as a substitute for the letter "O" in the word "LOVE" as part of the Johnny Love name. Jim Beam, in contrast, selected a stock art image of lips that show many creases and which is oval and elongated:

 

JL Lips Mark                    Pucker Vodka Lips

The product names—"Pucker" and "Johnny Love"—are dissimilar in sight, sound, and meaning. Moreover, Jim Beam's prior successful use of the Pucker name in association with liqueurs means that consumers who encounter Jim Beam's new line of Pucker flavored vodkas are more likely to believe that the product is an extension of the existing Pucker liqueur line than they are to believe that it is somehow associated or affiliated with a vodka product bearing a different name.

These noticeable differences in the products' trade dress and the commercial impression each creates could be seen at trial. None of the witnesses had any trouble identifying which products were which from a distance, even though the products were interspersed among one another (which is not how consumers typically engage the products in stores). (*See* ECF No. 265 at 24-28; ECF No. 266 at 70-71, 132, 134-36, 158.) ///

Both parties presented testimony about how the products would be displayed to customers at bars and restaurants. Mr. Diab of JL Beverage testified that he had seen 750 ml bottles of Johnny Love Vodka and Pucker Vodka displayed in bars with pour spouts inserted into them instead of the closures depicted above. (ECF No. 265 at 28.) Ms. Roberts of Jim Beam testified that Pucker Vodka would rarely be seen with a pour spout by consumers at bars and restaurants because only liquors in the well behind the bar would have pour spouts. (ECF No. 266 at 159, 185-89.) The Court finds that Ms. Roberts's testimony was more credible. Ms. Roberts testified that she goes to bars as part of her work at least once or twice a week. (*Id.* at 185.) Ms. Roberts also used jargon that suggested her familiarity with the business and standard bar practices. (*Id.* at 159 (explaining the "well"); *id.* at 185 (using and explaining terms such as "call brands" and "speed rack").) By contrast, JL Beverage did not establish the regularity with which Mr. Diab frequents bars, and Mr. Diab's testimony was only that he had had the experience of seeing the products displayed with pour spouts—not that this was common. (*See* ECF No. 265 at 28.) Accordingly, the Court finds that consumers encountering Pucker Vodka at a bar or restaurant would see it in its full trade dress with the manufacturer's closure as opposed to a metal pour spout. However, even if the products were displayed in bars with pour spouts inserted into them as Mr. Diab testified, the distinctiveness of the bottles as discussed above is not compromised.

### 4. Actual Confusion

The original creator of Johnny Love Vodka, Johnny Metheny, testified that he and others view the Pucker Vodka lips design as similar to the Johnny Love Vodka lips, and that some people even told Mr. Metheny that "Pucker stole your lips." (Deposition of Johnny Metheny ("Metheny Dep.") at 86-88.[8])

JL Beverage did not offer any additional witness testimony about actual confusion and did not commission (or at least did not offer at trial) any consumer confusion surveys.

---

[8]The Court admitted Jim Beam's designations of and exhibits to the depositions of Johnny Metheny into evidence at trial. (ECF No. 266 at 78-79.)

Jim Beam is not aware of any incidents where a consumer ever thought that Jim Beam or its Pucker Vodka was somehow connected with JL Beverage, or contacted Jim Beam to ask, inquire, or complain about Johnny Love Vodka. (*See* ECF No. 266 at 152.)

If Johnny Love Vodka and Pucker Vodka were offered for sale in the same retail store, they would likely occupy the same general shelving area because they are both vodkas. (Metheny Dep. at 89.) However, JL Beverage introduced no evidence that Johnny Love Vodka and Pucker Vodka have actually been sold in the same store at the same time given that JL Beverage wound down its operations in 2008, and Pucker Vodka did not hit the market until 2011. (*See* ECF No. 265 at 188-90; Washington Dep. at 27, 66; Martin Dep. at 44.)

JL Beverage's failure to offer more than a modicum of evidence of actual confusion does not weigh against a finding of a likelihood of confusion. *La Quinta*, 762 F.3d. at 875 (quoting *Sleekcraft*, 599 F.2d at 352) (explaining that the failure of a plaintiff to offer proof of instances of actual confusion weighs against a finding of a likelihood of confusion only when "the particular circumstances indicate such evidence should have been available," such as when both products have been in the market for a long time). However, JL Beverage's minimal evidence of actual confusion was rebutted by Jim Beam's evidence of an absence of actual confusion.

### 5. Marketing Channels

With regard to marketing channels, both parties use the well-established, three-tier alcoholic beverage distribution system to sell their products. The parties' shared use of this system, however, sheds little, if any, light on the issue at hand. *See Network Automation, Inc.*, 638 F.3d at 1151 ("[S]hared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion.").

### 6. Degree of Care Exercised by Consumers

Under the sixth factor, courts examine "the type of good or service offered and the degree of care one would expect from 'the average buyer exercising ordinary caution.'" *La Quinta*, 762 F.3d at 877 (quoting *Sleekcraft*, 599 F.2d at 353). "The likelihood of consumer

confusion decreases where the consumer is sophisticated and exercises a high degree of care." *Sand Hill Advisors, LLC v. Sand Hill Advisors, LLC*, 680 F. Supp. 2d 1107, 1120 (N.D. Cal. 2010); *see also Electropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125, 1131 (C.D. Cal. 2001) ("[A] realistic evaluation of consumer confusion must attempt to recreate the conditions in which buying decisions are made, and the court should try to determine . . . what a reasonable purchaser in market conditions would do.") (quoting *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 504 (8th Cir. 1987)).

Consumers occasionally give some thought to distilled spirits products before deciding to purchase them. For example, Mr. Metheny (the bartender who created Johnny Love) testified that he personally observed consumers taking a bottle of flavored vodka off the shelf and looking the bottle up and down before deciding whether to purchase it. (Metheny Dep. at 36-37.)

Similarly, when ordering products at a bar or restaurant, consumers tend to order by the product brand names, whether because they are already aware of the name (having heard of it before) or because the brand name is the most prominent feature displayed on the bottle (and thus the primary source for identification). (*See* Second Deposition of Thomas J. Diab ("Second Diab Dep.") at 89.[9])

Consequently, this factor weighs against a finding of likelihood of confusion.

Other than JL Beverage and Jim Beam, no other company markets or sells flavored vodka using a lips mark. (Metheny Dep. at 85-86.) However, many companies use lips designs in connection with alcoholic beverages and other consumer products. (ECF No. 47 at 4-12.) This weighs against a finding of likelihood of confusion. *See Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir.1988), *abrogated in part on other grounds by Eclipse Assocs. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1116 n.1 (9th ///

---

[9]The Court admitted Defendants' previously noticed designations of, and exhibits to, Mr. Diab's second deposition. (ECF No. 266 at 78-79.)

Cir.1990) (in a crowded field, "customers will not likely be confused between any two members of the crowd and may have learned to carefully pick out one from the other").

### 7. Intent

The assessment of the intent factor varies depending on whether one is considering "forward" or "reverse" confusion. Under either scenario, however, Jim Beam acted in good faith.

"When considering forward confusion, [the court] ask[s] 'whether defendant in adopting its mark intended to capitalize on plaintiff's good will.'" *Marketquest Group, Inc. BIC Corp.*, 862 F.3d 927, 934 (9th Cir. 2017) (quoting *Fortune Dynamic*, 618 F.3d at 1043). In a reverse confusion case, though, the junior user typically has no desire to "siphon off the other's goodwill." *Id.* Thus, courts in "reverse" cases consider whether the defendant "deliberately intended to push the plaintiff out of the market by flooding the market with advertising to create reverse confusion" or "culpably disregarded the risk of reverse confusion" by, for example, failing to "conduct a reasonably adequate trademark search." *Id.*

JL Beverage did not introduce evidence that Jim Beam acted intentionally to capitalize on or siphon off the goodwill of the Johnny Love Vodka brand. First, Johnny Love Vodka had little goodwill to merit such action. Second, Emily Johnson's email to JL Beverage does not demonstrate bad intent, particularly when evaluated in context with the arduous efforts Jim Beam put into designing Pucker Vodka.

The Court finds that the intent factor does not weigh in favor of a finding of likelihood of confusion.

### 8. Expansion

The "likelihood of expansion" factor is irrelevant here because the products are already considered related. *See JL Beverage*, 899 F. Supp. 2d at 1008 (citing *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1029 (9th Cir. 2004)).

In sum, the Court finds that JL Beverage cannot succeed on its infringement claims because there is no likelihood of confusion as discussed.

29

## B.    Jim Beam's Counterclaim for Cancellation

Jim Beam seeks to cancel JL Beverage's JL Lips Mark registration based on its similarity to the Beam Lips Mark. Both are depicted below:

  

Beam Lips Mark                JL Lips Mark

"The Lanham Act . . . authorizes 'any person who believes that he is or will be damaged . . . by the registration of a mark' to petition to cancel the registration." *Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*, No. 17-55325, 2018 WL 3188328, at *4 (9th Cir. June 29, 2018). "[B]eing sued for infringement . . . is sufficient to support standing for a counterclaim for cancellation." *World Mkt. Ctr. Venture, LLC v. Texas Int'l Prop. Assocs.*, No. 2:08-cv-01753-RCJ-GWF, 2009 WL 3303758, *3 (D. Nev. Oct. 14, 2009). Thus, Jim Beam has standing to seek cancellation of the JL Lips Mark.

"A petition brought within five years of registration (against a contestable mark) may assert any ground that would have prevented registration in the first place—most commonly that the registered mark creates a likelihood of confusion with the petitioner's preexisting mark." *Pinkette Clothing*, 2018 WL 3188328, at *6. Here, Jim Beam argues that the JL Lips Mark creates a likelihood of confusion with the Beam Lips Mark. (ECF No. 267 at 45.)

The inquiry for determining "likelihood of confusion for purposes of registration is the same standard as likelihood of confusion for purposes of infringement." *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1307 (2015); *see also Synoptek, LLC v. Synaptek Corp.*, No. SACV 16–01838–CJC(JCGx), 2018 WL 1980748, at *6 (C.D. Cal. Mar. 5, 2018); *Wallach v. Longevity Network, Ltd.*, No. CV04-2404 SJO RZX, 2005 WL 5958091, at *9 (C.D. Cal. Sept. 1, 2005). Thus, Jim Beam's argument that the court should evaluate the similarity of the marks in the abstract and divorced from their trade dress is unpersuasive. (*See* ECF No. 267 at 45.)

The Court finds that there is no likelihood of confusion because the marks are so plainly dissimilar. The Beam Lips Mark is far more stylized than the JL Lips Mark, which has naturalistic features including lip creases and the absence of color in areas where the "lips" did not make full contact with the bottle. The Beam Lips Mark features solid lines and could never be mistaken for an actual lipstick print. Though perhaps sophisticated in its own right, the Beam Lips Mark's cartoonish quality differs markedly from the naturalistic depiction of lips in the JL Lips Mark.

Accordingly, the Court will grant judgment in favor of JL Beverage on Jim Beam's third counterclaim for relief. In addition, the Court will grant judgment in favor of JL Beverage on Jim Beam's first and second counterclaims for relief because Jim Beam did not introduce evidence at trial to support either counterclaim. (*See* ECF No. 270 at 30.)

**V.    CONCLUSION**

It is therefore ordered that judgment is granted in favor of Jim Beam on JL Beverage's claims for relief.

It is further ordered that judgment is granted in favor of JL Beverage on Jim Beam's first, second, and third counterclaims for relief.

The Clerk of the Court is ordered to enter judgment accordingly and close the case.

DATED THIS 27th day of July 2018.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE

31